**Case Nos. 21-1414 and 22-1027**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

JANE DOES 1-11; JOHN DOES 1, 3-7,
*Plaintiffs - Appellants,*

v.

THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO;
TODD SALIMAN, President of the University of Colorado, in his official capacity;
DONALD ELLIMAN, Chancellor of the University of Colorado Anschutz Campus,
in his personal and official capacities; SHANTA ZIMMER, Senior Associate Dean of Medical Education,
University of Colorado School of Medicine, in her personal and official capacities;
ERIC MEDIAVILLA, Associate Dean for Student Affairs, University of Colorado School of
Dental Medicine, in his personal and official capacities; ANN-MICHAEL HOLLAND, Master of Science
Program Director, Department of Anesthesiology, in her personal and official capacities;
JOHN & JANE DOES 1-9, members of the Vaccine Verify team, in their official & personal capacities,
*Defendants - Appellees.*

*Appeals from the United States District Court for the District of Colorado (Denver),*
*Case No. 1:21-CV-02637-RM-KMT · Honorable Raymond P. Moore, U.S. District Judge*

# APPELLANTS' OPENING BRIEF
## *(Oral Argument is Requested)*

JOSEPH B. BROWN
THERESA L. SIDEBOTHAM
TELIOS LAW
19925 Monument Hill Road
P.O. Box 3488
Monument, Colorado 80132
Telephone: (858) 748-4201
jbb@telioslaw.com
tls@telioslaw.com

PETER C. BREEN
THOMAS MORE SOCIETY
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
Telephone: (312) 782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org

MICHAEL G. MCHALE
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
Telephone: (402) 501-8586
mmchale@thomasmoresociety.org

*Attorneys for Plaintiffs and Appellants*



# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

JURISDICTIONAL STATEMENT ........................................................6

ISSUES PRESENTED.............................................................................7

STATEMENT OF THE CASE .................................................................7

    A.  Pre-September 1 Vaccine Mandate. ...............................................7

    B.  September 1 Policy..........................................................................8

        1.    The Policy's de facto application............................................8

        2.    The Policy's formal adoption and scope...............................11

    C.  September 24 Policy.......................................................................13

    D. Plaintiffs-Appellants.......................................................................15

        1.    Off-Campus employees..........................................................15

        2.    On-campus employees. ..........................................................18

        3.    Students..................................................................................20

    E. COVID-19 and Vaccine Alternatives............................................22

    F. Procedural History. ........................................................................25

STANDARD OF REVIEW .....................................................................29

SUMMARY OF ARGUMENT ................................................................29

ARGUMENT ...........................................................................................32

   I.   Plaintiffs Have Made a Strong Showing They Are Likely to Succeed on
      Their First Amendment Claims. ......................................................33

    A.  Plaintiffs' challenges to the September 1 Policy are not moot .................33

    B.  Defendants' Actions Under the September 1 and September 24 Policies
        Flagrantly Violate the First Amendment's Religion Clauses. ...................36

1.    The September 24 Policy is not neutral with respect to religion ......... 38

2.    The September 24 Policy is not generally applicable. ..........................47

C.   The September 24 Policy easily fails strict scrutiny. .................................52

D.   The September 24 Policy also fails rational basis review..........................56

II.   Plaintiffs Are Suffering Irreparable Harm and the Equities Strongly Favor a
      Preliminary Injunction. ...................................................................................57

E.   Irreparable harm. ........................................................................................57

F.   Public Interest and Balance of Harms. .......................................................58

CONCLUSION .........................................................................................................59

District Court Order, October 25, 2021……………………………Attachment 1

District Court Order, January 27, 2022……………………………Attachment 2

## TABLE OF AUTHORITIES

**Cases**

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ............................................................44

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ..............................................................................29

*Brown v. Buhlman*,
822 F.3d 1151 (10th Cir. 2016) ............................................................48

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ..............................................................................53

*Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*,
483 F.3d 1025 (10th Cir. 2007) ............................................................56

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........................................................ 38, 41, 42, 46

*Dahl v. Bd. of Trustees of W. Michigan Univ.*,
15 F.4th 728 (6th Cir. 2021) ................................................................55

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021) ..............................................................40

*Doe v. San Diego Unified Sch. Dist.*,
22 F.4th 1099 (9th Cir. 2022) ..............................................................39

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021) ...................................................................... 49, 56

*Dr. A. v. Hochul*,
142 S. Ct. 552 (2021) ............................................................................50

*Emp. Div. Dep't of Hum. Res. of Oregon v. Smith*,

494 U.S. 872 (1990) ..................................................................................1

*Equal Emp. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*,
869 F.3d 1171 (10th Cir. 2017)...............................................................33

*Espinoza v. Montana Dep't of Revenue*,
140 S. Ct. 2246 (2020)..................................................................... 38, 42

*First Baptist Church v. Kelly*,
455 F.Supp.3d 1079 (D. Kan. 2020) ......................................................39

*Fisch v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ......................................................... 29, 57

*Fulton v. City of Philadelphia, Pennsylvania*,
141 S. Ct. 1868 (2021)..................................................... 37, 47, 52

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ...................................................... 32, 58

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ....................................................................37

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
138 S. Ct. 1719 (2018)................................................... 37, 42, 46

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................................................................................55

*New Hope Fam. Servs., Inc. v. Poole*,
966 F.3d 145 (2d Cir. 2020) ...................................................................44

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................58

*Prison Legal News v. Fed. Bureau of Prisons*,
944 F.3d 868 (10th Cir. 2019) ................................................................33

*Ramos v. Louisiana*,
140 S.Ct. 1390 (2020) .............................................................................42

*Rezaq v. Nalley*,
   677 F.3d 1001 (10th Cir. 2012) ..................................................................... 33, 34

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) ................................................................................58

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020)..............................................................................................54

*S. Bay United Pentecostal Church v. Newsom*,
   141 S. Ct. 716 (2021)............................................................................................39

*Schrier v. Univ. of Colo.*,
   427 F.3d 1253 (10th Cir. 2005).............................................................................32

*Shrum v. City of Coweta, Okla.*,
   449 F.3d 1132 (10th Cir. 2006) ..................................................................... 40, 41

*Smith v. Allen*,
   502 F.3d 1255 (11th Cir. 2007) .............................................................................36

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021)............................................................... 47, 52, 54, 55

*Thomas v. Rev. Bd. of Indiana Sec. Div.*,
   450 U.S. 708 (1981) ..............................................................................................53

*Thoms v. Maricopa Cnty. Cmty. College Dist.*,
   No. 2:21-cv-01781, 2021 WL 5162538 (D. Ariz. Nov. 5, 2021).........................49

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2021 (2017)..........................................................................................38

*U.S. Navy Seals 1-26 v. Biden*,
   No. 22-10077, 2022 WL 594375 (5th Cir. 2022)..................................................54

*We the Patriots USA, Inc. v. Hochul*,
   17 F.4th 266 (2d Cir. 2021) ..................................................................................58

## Statutes

28 U.S.C. § 1292(a)(1) ................................................................6

28 U.S.C. §§ 1331 and 1343 .......................................................7

42 U.S.C. § 2000e(j) ...............................................................2, 13

## Other Authorities

CDC, COVID-19, *Types of Masks and Respirators – Summary of Recent Changes*,
    Jan 28, 2022, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
    sick/types-of-masks.html .......................................................24

Chancellor Elliman Communiques, COVID-19 on Decline (Feb. 18, 2022),
    https://www.cuanschutz.edu/about/leadership/chancellor/communiques/updating
    -campus-protocols-with-covid-19-on-decline ...................................25

Colin Woodard, "Unvaccinated patients and employees driving COVID outbreaks
    in Maine hospitals," Portland Press Herald, Oct. 21, 2021,
    https://www.pressherald.com/2021/10/21/unvaccinated-patientsand- ...............12

David Gartenberg and Laura Spector, "Colorado's Vaccine Mandate for
    Healthcare Providers Remains in Effect Despite Stays to CMS Vaccine
    Mandate," Littler, Dec. 15, 2021,  https://www.littler.com/publication-
    press/publication/colorados-vaccine-mandate-healthcare-providers-remains-
    effect-despite ......................................................................24

*John Daley*, "Colorado patients and providers alike are frustrated, angry and
    worried as COVID cases pack hospitals across the state," CPR News, Dec. 9,
    2021, https://www.cpr.org/2021/12/09/colorado-covid-cases-hospitalizations-
    staffing-shortage/ .................................................................59

John Daley, "Colorado's vaccine mandate did drive a lot of health care and government workers to get the shot – some more than others, though," CPR News, Nov. 1, 2021, https://www.cpr.org/2021/11/01/colorado-covid-vaccine-mandate-health-care-government-workers/ ............................................................ 5

Joseph Choi, "Pfizer CEO says a fourth booster shot 'is necessary,'" The Hill, March 13, 2022, https://thehill.com/policy/healthcare/598026-pfizer-ceo-says-a-fourth-booster-shot-is-necessary ........................................................... 52

Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1190, 1225 (March 2022) ...................................................................................................................... 45

Mark C. Gillespie, *Level-Up Remedies For Religious Discrimination*, 44 Harv.J.L.P.P. 637, 961 (2021) ............................................................................ 46

Elie Dolgin, "Omicron thwarts some of the world's most-used COVID vaccines," Nature, Jan. 13, 2022, https://www.nature.com/articles/d41586-022-00079-6; CDC, COVID-19, *Omicron Variant: What You Need to Know* .......................... 24

**Statement of Related Cases**

There are no prior or related appeals of which Plaintiffs are aware.

## PRELIMINARY STATEMENT

Last fall, the University of Colorado adopted a COVID-19 Vaccine Mandate, with a unique religious exemption provision solely for those on the Anschutz Campus: "A religious exemption may be submitted based on a person's *religious belief* whose *teachings* are *opposed to all immunizations*." ("September 1 Policy") (App.Vol.V 1123.)[1] This policy expressly delimited religious exemptions based on *both* religious *denomination* and the *nature* of one's religious beliefs—an act of brazen discrimination rarely seen in the modern era. As Justice O'Connor once put it, "few States would be so naïve as to . . . directly prohibit[] or burden[] a religious practice as such." *Emp. Div. Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 894 (1990) (O'Connor, J., concurring).

Defendants-Appellees applied the September 1 Policy with full gusto, telling Plaintiff-Appellant John Doe 1, a devout Buddhist first-year medical student, that his exemption request must "cite to the official doctrine of an organized religion, in this case, Buddhism, as announced by the leaders of that religion." (App.Vol.V 1065-1066.) Defendants refused to back down in the face of *multiple* demand letters, even responding to one from Plaintiff Dr. Jane Doe 1, a devout Catholic

---

[1] All emphasis is added in this brief unless otherwise noted.

pediatric critical care physician, that "[t]here has been no First Amendment violation."[2] (App.Vol.V 1134.)

Unsurprisingly, nobody—including the 17 Plaintiffs in this case—received a religious exemption under the September 1 Policy. (*See* App.Vol.II 313, Vol.VI 1284–1287.) At the same time, "medical exemptions" were readily available, and at least some individuals received them under the same policy. (App.Vol.V 1123–1124, Vol.VI 1284–1287.)

Then, without notice to these Plaintiffs or to the public, under threat of litigation, Defendants amended the September 1 Policy solely altering its exemption terms. ("September 24 Policy.") (App.Vol.V 1253–58.) The new terms ostensibly tracked Title VII of the Civil Rights Act of 1964, allowing religious exemptions for *employees* with sincerely held religious objections to the vaccine unless exemption would pose an "undue hardship" on the University. (Id., 1255–1256.) *See* 42 U.S.C. § 2000e(j). At the same time, the new policy *explicitly prohibited students* from seeking religious exemptions, but continued to allow both students and employees to seek medical exemptions.  (Id., 1256.) For months Defendants took no steps to reconsider the religious exemption requests they had denied under the earlier September 1 Policy.

---

[2] While this letter also alleged Dr. Jane Doe 1 would be an "undue hardship" if she remained unvaccinated, it expressed additional disrespect for the authenticity of her religious beliefs: "We sincerely urge Dr. [Jane Doe 1] to *reconsider her position and receive a COVID-19 vaccine*."  (App.Vol.V 1137)

After Jane Doe 1 and John Doe 1 filed this lawsuit challenging only the September 1 Policy (the only one which they knew of at the time), Defendants responded by revealing their new September 24 Policy and *tripling down* on the September 1 Policy's supposed constitutionality, absurdly stating that the policies "both . . . employ[]" the *same* allegedly neutral "process" for considering religious exemptions. (App.Vol.I 253.) And Defendants *continued* to presume the illegitimacy of Jane Doe 1's religious beliefs under the September 24 Policy, saying that "as a bioethicist" (*see infra*), she "was surely aware" that drugs like Tylenol and Aspirin that she herself prescribes "have been tested on the same" aborted-fetal cell line as available COVID vaccines (id. 244-45) (i.e., the basis for her religious objection to said vaccines, *see infra*)—despite the fact those drugs have been in use since the 1800s and have no *intrinsic* connection to abortion at all. (App.Vol.II 219, Vol. III 613, ¶¶28-29.)

Defendants would later try to cover their tracks, well after Plaintiffs filed an Amended and Supplemental Complaint and a Renewed Motion for Preliminary Injunction against both the September 1 and September 24 Policies. (App.Vol.III 879, Vol.IV 968.) On December 9—the eve of Defendants' extended response deadline to Plaintiffs' renewed motion—Defendants sent still-employed staff Plaintiffs purported "reconsiderations" (and continued denials) of their religious exemption requests under the September 24 Policy, for being alleged "undue

hardships" on the University. (App.Vol.VI 1287–1288, 1330–1341.) However, six employee Plaintiffs were *removed* from the scope of the Policy and allowed to work entirely remote or in isolation.[3] (Id., 1278.) Moreover, Defendants claimed in their Response that they had now cleansed the Anschutz campus of all previously granted medical exceptions for those in clinical settings, calling those exemptions a "mistake" that had been "remedied." (App.Vol.VI 1277.)

When the dust settled after Defendants' mid-litigation maneuvers, Plaintiffs effectively remained in the same positions as they had been under the September 1 Policy.

Plaintiffs embrace a variety of faith traditions, and each has a sincere religious objection to the currently available COVID vaccines, including because said vaccines were developed through use of or testing on aborted fetal stem cells or because some even religiously oppose all vaccines. (App.Vol.V 1042-1080.)

Jane Does 1 through 11 are nine employees of the University (including three physicians), a fourth-year student in the School of Dental Medicine, and a student in a dual degree bachelor's and master's program in public health. (Id.,

---

[3] Defendants say these six Plaintiffs were granted "accommodations" because they can work remotely, but the September 24 Policy applies only to those who "currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program, or whose . . . activities may require in-person interaction with other CU Anschutz" individuals. (App.Vol.V 1253.) Indeed, all six had also been allowed to temporarily work remotely or in isolation under the September 1 Policy (see *infra*).

1024.) John Does 1 and 3 through 7 are four employees and three students at Anschutz (including one M.D. candidate in the medical school and one master's anesthesiology student).[4] (Id., 1024.) Many of them served heroically on the healthcare "front-lines" throughout the pandemic, only to be tossed aside in the fall of 2021.

Notably, at least three Plaintiffs, Jane Does 1, 5 and 11, *worked exclusively at off-campus facilities*, and were either personally exempted or eligible for exemption under those facilities' own policies, as permitted by the Colorado State Board of Health. (App.Vol.V 1025, 1027, 1030, Vol.VI 1441–1443.) Further, Defendants expect many of their healthcare employees and students to provide services at affiliated sites that have granted numerous medical or religious exemptions to non-Anschutz employees, despite Defendants' assertion that *any* unvaccinated healthcare worker poses an unacceptable threat to Anschutz staff and students. (App.Vol.VI 1279–1284.) Indeed, UC Health "granted 1,100 medical or religious exemptions"[5] to employees who may freely interact with Anschutz employees and students, but Defendants refused to grant even one—even to those who do not work on the Anschutz campus at all.

---

[4] John Doe 2 was voluntarily dismissed previously. (App.Vol.I  22.)

[5] John Daley, "Colorado's vaccine mandate did drive a lot of health care and government workers to get the shot – some more than others, though," CPR News, Nov. 1, 2021, https://www.cpr.org/2021/11/01/colorado-covid-vaccine-mandate-health-care-government-workers/.

This schematic reveals Defendants' actions for what they are—a sustained, unapologetic effort to eliminate those with the "wrong" religious beliefs from the Anschutz community, based on a presumptively unconstitutional distrust of their religious objections to COVID vaccines. This is only confirmed in the Policies' obtuse, vastly overinclusive application to the Plaintiffs who never set foot on the Anschutz campus, no matter how needed (and wanted) their services or how lacking the evidence they have caused any harm. Defendants were so committed to winning judicial approval of their anti-religious bias that they later purged even those with a medical inability to receive COVID vaccination, creating a veneer of equal treatment with the already purged Plaintiffs.

And even considering the September 24 Policy in a vacuum, it still plainly violates religious neutrality, including as to student religious objectors who remain explicitly barred from seeking religious exemptions, and is undermined by its own exceptions (de jure and de facto) while failing to provide Plaintiffs with actual equal treatment. This alone triggers strict scrutiny and violates the First Amendment. Accordingly, the district court's denials of Plaintiffs' motions for preliminary injunctions should be reversed.

## JURISDICTIONAL STATEMENT

This is a consolidated appeal pursuant to 28 U.S.C. § 1292(a)(1) from the denial of two preliminary injunction motions by the U.S. District Court for the

District of Colorado. The district court had federal question jurisdiction over Plaintiffs' First Amendment claims at issue in this appeal under 28 U.S.C. §§ 1331 and 1343. The district court denied the first motion for preliminary injunction on October 25, 2021 (App.Vol.III 624), which Plaintiffs timely appealed on November 24, 2021 (App.Vol.V 1259). The district court denied the second motion for preliminary injunction on January 27, 2022 (App.Vol.VII 1663-1675), which Plaintiffs timely appealed on January 28, 2022. (Id., 1676.)

## ISSUES PRESENTED

1. Whether the district court erred in holding that Plaintiffs-Appellants' challenges to Defendants-Appellees' September 1 Policy are moot.

2. Whether the district court erred in holding that the September 24 Policy is a neutral and generally applicable burden on Plaintiffs-Appellants' religious exercise and satisfies rational basis scrutiny.

3. Whether Plaintiffs-Appellants are entitled to preliminary injunctive relief against Defendants-Appellees' various refusals to consider and grant them religious exemptions to COVID-19 vaccination.

## STATEMENT OF THE CASE

### A.  Pre-September 1 Vaccine Mandate.

In April 2021, four months after COVID-19 vaccines became available to the public, the University adopted a policy that all staff and students must be

COVID-19 vaccinated before the start of the fall semester.  (App.Vol.V 1035.) The

mandate provided that religious exemptions would be available pursuant to

"current CU vaccination policy," and Defendants confirmed that Anschutz Campus

staff and students would be allowed the same. (Id., 1035–1036.)

Initially, Defendants provided that students and employees must simply

"attest to their exemption based on their religious beliefs." (Id.) Students merely

needed to "submit their religious exemption form to their program before

beginning the fall 2021 semester," while "[t]here is no form necessary for

employee religious exemptions; you may simply select this option as you complete

the vaccine verification process." (Id.) Student John Doe 1, for example, was

assured by campus authorities that "a religious exemption will just require the

individual's signature attesting to it being consistent with their religious beliefs."

(Id., 1063–1064.) But for those on the Anschutz Campus—and for them only—all

that soon changed.

### B.    September 1 Policy.

#### 1.    The Policy's de facto application.

In mid-August 2021, as John Doe 1 sought to finalize his status before the

fall semester, he was advised that a new vaccination policy had taken effect. (Id.,

1065.) In the days that followed, an anonymous "Vaccine Verify" team began

emailing religious exemption requestees a two-question survey ostensibly probing

into the sincerity *and legitimacy* of their religious objections to COVID vaccines. (Id., 1041, ¶68.) The first question sought "detail[s]" explaining why their "sincerely held religious belief" prevented them from receiving COVID vaccination; the second asked, "Have you had an influenza or other vaccine in the past? How does this differ?" (Id.,) They had only two days to respond. (Id.) As many exemption requestees would soon learn, any answer to these questions was utterly futile—and fatal to their status at Anschutz.

On August 26, 2021, after having diligently answered the inquiry, most of these employee Plaintiffs received a terse, mass-produced form email, without even a personalized salutation, from the anonymous "Vaccine Verification Team" stating that their religious exemption requests had been denied because "campus policy" "only recognizes religious exemptions based on religious beliefs whose *teachings* are opposed to *all* immunizations." (Id., 1044 – 1080, ¶¶71, 90, 96, 100, 108, 114, 117, 154, 164, 175.) There was no opportunity to appeal, and these employees were instructed to "submit your vaccine verification form" by September 1, or otherwise face "additional actions . . . including but not limited to termination." (Id., 1044, 1129.)

Some Plaintiffs were victims of more individualized discrimination. On August 24, 2021, student John Doe 1 received an email from the "Student Response Team" (headed by Defendant Zimmer) requesting "documentation that

9

demonstrates your religion is opposed to all immunizations." (Id., 1065-1066,

¶136.) As previously noted, the email explicitly required that he "cite to the official

doctrine of an organized religion, in this case, Buddhism, as announced by the

leaders of that religion." (Id.) The email then revealed Defendants had begun

conducting brazen religious inquisitions:

> Please note, that in the course of reviewing your request, the University learned that the Dharma Realm Buddhist University set up by the Dharma Master Xuan Hua[6] who you list in your letter is in fact requiring vaccinations for all of its students, faculty and staff. https://www.buddhistdoor.net/news/dharma-realm-buddhistuniversity-in-california-resumes-in-person-classes-with-largest-student-cohort

(Id.) On August 30, after John Doe 1 re-asserted his religious objection, Defendant

Zimmer emailed him a denial letter concluding that "[t]he basis for your objections

are all of a personal nature and *not part of a comprehensive system of religious*

*beliefs*." (Id., 1067, ¶141.)

Meanwhile, John Doe 6, a first-year student in Anschutz's master's program

in anesthesiology, was personally informed by Defendant Zimmer that religious

requests could be approved only for those students who would never get *any*

vaccinations, "*like Christian Scientists*." (Id., 1077, ¶169.) Program Director Ann-

Michael Holland tendered John Doe 6 a denial letter soon afterwards, stating *both*

that he would be an "undue hardship" on the program if he remained unvaccinated,

---

[6] Master Xuan Hua died in 1995, well before the Buddhist University adopted its COVID-19 vaccine policy. https://en.wikipedia.org/wiki/Hsuan_Hua.

*and* that his religious objection to the COVID-19 vaccine was "of a personal nature and *not part of a comprehensive system of religious beliefs*." (Id., 1249.)

Another explicitly discriminatory denial occurred on September 2, when a decorated fourth-year medical student and devout Catholic ("Student A") received his own denial letter from Defendant Zimmer. The letter rejected Student A's asserted Catholic beliefs opposing COVID vaccination (verified in writing by his local Catholic priest), asserting instead that "the Vatican's doctrinal office, the Congregation for the Doctrine of the Faith (CDF), issued a statement noting it is 'morally acceptable' for Catholics to take vaccines against COVID-19." (Id., 1162–1163.) Thus, in Defendants' theological wisdom, Student A's objection was "of a personal nature and not part of a comprehensive system of beliefs." (Id., 1163.) After a demand letter by undersigned counsel on Student A's behalf to University counsel, Defendants' granted a medical exemption to Student A (which he was also seeking), sidestepping his request for religious exemption. (Id., 1164–1172.)

## 2.    The Policy's formal adoption and scope.

This explicit religious discrimination was memorialized in the Anschutz "Campus Administrative Policy" requiring COVID-19 vaccination (including booster shots) for students and staff on September 1, 2021 ("September 1 Policy"). (Id., 1123.) In contrast, "medical exemptions" were available simply "if

vaccination is medically contraindicated due to other medical conditions or due to a physical condition that would cause vaccination to endanger an individual's life or health," as attested to by a physician, advanced practice nurse, or physician assistant. (Id., 1123–1124.)

As to the scope of the Policy, it applied only to students and employees "who are, or may access any University facility or participate in any University program, or whose employment or academic activities may require in-person interaction with others. (Id., 1122.) It did not apply to remote workers. And it did not apply to patients, despite their manifest risk of contracting and spreading COVID within the Anschutz community.[7] Moreover, nothing in the Policy prohibited vaccinated students and employees from continuing to perform healthcare work at Anschutz affiliates with their own exemption policies, including UC Health University of Colorado, Children's Hospital Colorado, Rocky Mountain VA Medical Center,[8] Denver Health Medical Center, and National Jewish Health.[9]

In the end, all 17 Plaintiffs were denied religious exemptions under the blatantly discriminatory September 1 Policy. (Id., 1038, ¶55.) While some were

---

[7] Colin Woodard, "Unvaccinated patients and employees driving COVID outbreaks in Maine hospitals," Portland Press Herald, Oct. 21, 2021, https://www.pressherald.com/2021/10/21/unvaccinated-patientsand-staff-still-driving-hospital-outbreaks/.

[8] E.g., Jane Doe 3 remains on staff and working at the VA, alongside Anschutz employees. (App.Vol.VI 1424-25.)

[9] https://medschool.cuanschutz.edu/patient-care/clinical-affairs/find-a-provider.

allowed to temporarily continue working remotely or in isolation—including six Plaintiffs whose work was in information technology or administration—all of their religious exemptions ultimately remained denied for belonging to the "wrong" religion.  (Id., 1052–1080, ¶¶94, 102, 155–56, 161, 165–66, 176–77.)

### C.     September 24 Policy.

As noted, on September 24, 2021, Defendants amended the September 1 Policy by replacing its explicitly discriminatory religious-exemption provision with one purporting to track Title VII of the Civil Rights Act of 1964, stating: "Individuals may receive a medical or religious accommodation if they are unable to receive the vaccine for medical reasons or sincerely held religious beliefs," unless (for a medical accommodation) it would pose "an undue hardship" or "a direct threat to the health and safety of the Individual or others," or (for a religious accommodation) it "would unduly burden the health and safety of other Individuals, patients, or the campus community." (App.Vol.V, 1255–1256.) *See* 42 U.S.C. § 2000e(j).

At the same time, the amendment established a categorical bar against religious-objecting students, stating: "Religious accommodations are not currently available to students or applicants." (Id., 1256.)

As the September 24 Policy itself states, its sole purpose was "[C]larifying language for religious and medical accommodations." (Id., 1258.) The scope of the Policy otherwise remained the same. (Id., 1254–1255.)

Tellingly, Defendants did not notify any Plaintiff (or Plaintiffs' counsel, for that matter) of the new Policy, or otherwise indicate any intent to reconsider their exemption requests thereunder. (Id., 1020, ¶5.) Defendants plainly believed they needn't do so, alleging in response to Jane Doe 1 and John Doe 1's first motion for preliminary injunction that, absurdly, "Under *both* the prior version and the current Policy, Defendants employs a two-step process in evaluating all requests for exemptions," first evaluating one's religious sincerity, and then determining whether an exemption would be an "undue hardship." (App.Vol.I 253.)

For months, therefore, the September 1 Policy concededly remained the sole basis of Defendants' refusal to grant the Plaintiffs' requests for religious exemptions. Meanwhile, Defendants' indisputably granted medical exemptions to some individuals who provided in-person medical care. (App.Vol.V 1164–1172.) Thus, while secular reasons for remaining unvaccinated were sometimes good enough for Defendants, religious reasons never were—notwithstanding the devastating and irrational impact it had on Plaintiffs.

### D. Plaintiffs-Appellants.

#### 1.    Off-Campus employees.

Jane Does 1, 5, and 11 were employed by Anschutz but worked exclusively at off-campus sites, two of which are more than 60 miles away from the Anschutz campus in Aurora, and two had their own exemption policies. (App.Vol.V 1025, 1027, 1030, ¶¶20, 26; Vol.VI 1441–1443.)

Dr. Jane Doe 1 worked as a pediatric critical care physician exclusively at Children's Hospital in Colorado Springs, approximately 60 miles from Aurora. (Id., 1025, ¶16.) In 2018, she obtained a master's degree in Catholic bioethics from the University of Mary in North Dakota, in association with the National Catholic Bioethics Center. (Id.) She is the mother of young children and relies on the income provided by Anschutz to support them. (Id.) Throughout the pandemic, she worked diligently on the frontlines at her hospital without contracting or spreading COVID in any way, to her knowledge. (App.Vol.III 613–614.) In the fall of 2021, she was informed by Children's Hospital that it would apply its own religious accommodation policy for its employees, based on expected directions from the Colorado Board of Health in late October 2021. (App.Vol.V 1082, ¶186.)

Despite all this, Dr. Jane Doe 1 still received the August 26 email from "Vaccine Verify" stating that, because she belonged to the wrong religion, she needed to be vaccinated by September 1 or face termination. (Id., 1044, ¶71.) The

decision sparked disgust from her direct supervisor at Children's Hospital,
Anschutz staffer Dr. Patrick Cripe, who wrote an email to his administration team
(which he later forwarded to Dr. Jane Doe 1) that Dr. Jane Doe 1 was a model
physician, and that Anschutz's decision-making process was plainly discriminatory
and would ultimately hurt sick children at the hospital. In particular, he wrote:

- Dr. Jane Doe 1 "dutifully wears PPE . . . , cleans workstations and phones,
  and follows all other infection control measures. Her convictions on the
  sanctity of life result in her treating ALL individuals equally in her practice
  of medicine which is an ideal we should all attempt to attain." (App.Vol.III
  617–618.)

- The University's "process . . . is abhorrent. . . . The policy appears to be
  intentionally vague, which will then force those of us (me) in middle
  management to impose the University's will. I am unwilling to do so at this
  time." (Id.)

- "The impact that this policy has on [Children's Hospital] is significant."
  Because another member of their relatively small specialty team would soon
  be on necessary leave, "[o]ur staffing model . . . will not accommodate this
  new change," which "potentially poses a risk to critically ill children in the
  region and/or those currently under our care. . . . My entire team of faculty
  will suffer from the way that this is being handled." (Id.)

16

Notwithstanding Anschutz's September 1 deadline, Dr. Jane Doe 1 was allowed to continue working through September, until Defendants, to avoid a potential TRO, put her on paid leave after she filed the first iteration of this lawsuit. (App.Vol.I 245.) She was terminated on January 31, 2022, after the district court's final denial of preliminary injunctive relief. (App.Vol.VII 1685.)

Jane Doe 11, through a contract with Anschutz, worked exclusively as a Psychiatric Mental Health Nurse Practitioner at the Colorado Mental Health Institute at Pueblo (a facility operated by the Colorado Department of Human Services) ("Department"), more than 100 miles from the Anschutz campus. (App.Vol.V 1030. ¶26.) The Department *approved* her request for religious accommodation to continue working at the Pueblo facility, but Defendants denied it. (App.Vol.VI 1441, ¶¶2–5.) Notably, her husband, who works at the same facility but solely under the auspices of the Department, also received a religious exemption. (Id., ¶2.) Under Anschutz's Policy, Jane Doe 11 could continue working with her unvaccinated husband only if she would succumb to vaccination, despite the alleged unacceptable threat that the unvaccinated pose to every member of the Anschutz community. She was also terminated on January 31, 2022. (App.Vol.VII 1687.)

As to Jane Doe 5, she worked exclusively as a program coordinator for an ambulatory surgical center in Englewood, Colorado. (App.Vol.V 1027, ¶20.)

Although the center applied Anschutz's own exemption policies, she has been allowed to work fully remote up to the present, though Defendants intend to fire her at any moment. (App.Vol.VI 1282.)

### 2. On-campus employees.

The remaining employee Plaintiffs worked fully or partially on the Anschutz campus, or had job duties that sometimes required being on campus.

Dr. Jane Doe 2 was a pediatric anesthesiologist and Associate Professor of Clinical Practice at Children's Hospital at the Anschutz Medical Campus in Aurora. (App.Vol.V 1026, ¶17.) After being denied a religious exemption, her supervisor advised that in lieu of termination, she could submit a letter of resignation to avoid potential difficulties with continuing licensure. (Id., 1046–1047, ¶79.) She chose the latter option under duress and separated from the University. (Id.) She was not re-evaluated under the September 24 Policy. (App.Vol.VI 1281.)

Dr. Jane Doe 3 is a physician with faculty appointments at both the Anschutz campus and the Rocky Mountain Regional VA Center also in Aurora. (App.Vol.V 1026, ¶18.) She received a religious exemption from the VA Center in her capacity as a staff member of the VA, but Anschutz denied her an exemption to work at the same site in her capacity as an Anschutz faculty member. (App.Vol.VI 1425–1426, ¶¶6-9.) She also contracted COVID-19 in August of 2021, has fully

recovered, and now has natural immunity to COVID-19. (App.Vol.V 1026, ¶18.) At this time, she remains on unpaid leave from the Anschutz-funded part of her work, while continuing at the VA with the VA-funded part of her work. (App.Vol.VI 1424-25.)

Dr. Jane Doe 4 is an instructor in multisystemic therapy at the Anschutz campus in Aurora. (App.Vol.V 1027, ¶19.) After being denied a religious exemption, she was allowed to work remotely on a temporary basis, and then in December she was permanently allowed to work remotely and thus removed from the scope of the Policy. (Id.; App.Vol.VI 1281–1282.)

Jane Doe 6 is a program manager for the Office of the Dean of Anschutz, and she was originally told she could work fully remote until the end of November. (App.Vol.V 1028.) In December she was likewise permanently allowed to work remotely and removed from the scope of the Policy. (App.Vol.VI 1282.)

Jane Doe 9 is a project coordinator of data and analytics in the Anschutz Division of Hospital Medicine. (App.Vol.V 1029, ¶24.) She was "[t]erminated" in October for allegedly visiting campus while unmasked (App.Vol.VI 1282–1283), even though she also received the August 26 mass email saying she was denied a religious exemption for belonging to the wrong religion (App.Vol.V 1059, ¶114). She, like Jane Doe 2, was *not* re-evaluated under the September 24 Policy. (App.Vol.VI 1282–1283.)

19

Jane Doe 10 was a clinical trials manager at the Cancer Clinical Trials Office at the Anschutz campus. (App.Vol.V 1029, ¶25.) She was temporarily allowed to work remotely and is presently on FMLA after the birth of her child through March 2022, after which time she will be fired. (App.Vol.VI 1283.)

John Does 3, 5, and 7 all work for the University's Office of Information Technology, which operates under the Anschutz vaccine policy. (App.Vol.V 1031–1032, ¶¶29, 30, 31, 33.) After being denied religious exemptions, all were temporarily allowed to work remotely, (id.) and in December that arrangement became permanent, thus removing them from the scope of the Policy. (App.Vol.VI 1284.)

John Doe 4 is a communications supervisor in the Anschutz Campus police department. (App.Vol.V 1031.) After his religious exemption was originally denied, and he persisted in his refusal to accept the vaccination, his pay was docked 10% (despite shouldering the same workload), and he was threatened with imminent termination. (Id.) Because his duties have been deemed "essential"—or at least more "essential" than other religious objectors—he has been allowed back to work on the Anschutz campus in a solitary closed room. (App.Vol.VI 1339.)

### 3. Students.

Last summer, John Doe 1 moved from Canada to Aurora to begin medical school at Anschutz after being assured by campus authorities in May 2021 that he

would be exempt from COVID vaccination by simply attesting that it violated his religious beliefs. (App.Vol.VI 1063–1064.) After multiple rounds of communication with campus officials about his exemption request upon arriving in Aurora, which culminated in a final denial, he was given the following ultimatum: "1. Obtain the vaccine 2. Take a one year leave of absence 3. Withdraw." (Id., 1067.) He chose the coerced leave of absence, requiring him to sell his local belongings, terminate his apartment lease, and incur unnecessary and unexpected expenses as a result of Defendants' actions. (Id.)

John Doe 6 was a first-year student in Anschutz's master's program in anesthesiology. (App.Vol.V 1032.) After failing to prevail in an internal appeals process, he also received the triple ultimatum noted above and chose to withdraw. (Id.; App.Vol.VI 1285.)

Jane Doe 8 is a dual-degree student seeking both bachelor's and master's degrees in public health, with the master's program taking place on the Anschutz campus. (App.Vol.V 1038.) Although she has been freely granted a religious exemption to continue her bachelor's-degree studies in public health at the University of Colorado's Denver campus, she was forced to withdraw from the master's program after her exemption denial from Anschutz. (Id.)[10]

_____

[10] The remaining student was Jane Doe 7, a fourth-year student at the School of Dental Medicine, (App.Vol.V 1028) who has since succumbed to COVID vaccination under duress after completing three-and-a-half years of studies.

21

In the end, these students and employees have all been purged from the Anschutz community—even those who never worked on the Anschutz campus to begin with. Many of their lives have been upended simply for belonging to the "wrong" religion. And still, Defendants refuse to back down, even as COVID severity and the efficacy of COVID vaccination dissipates.

### E. COVID-19 and Vaccine Alternatives.

In the course of this litigation, Defendants have insisted that COVID vaccination "is the *only* safe means of controlling the spread of COVID," and "there is no alternative to vaccination." (App.Vol.VI 1274.) But one of their own physician witnesses admitted that PPE "has been *quite effective* in preventing the spread of provider-to-patient and patient-to-provider infections if worn correctly," and has resulted in "provider-to-provider transmission" only when there has been "more lax behavior of physicians and staff when outside patient treatment areas." (App.Vol.VI 1345, ¶7.)

Moreover, throughout the course of the entire pandemic, there have been only three small COVID outbreaks in the Anschutz community, and *none* since *December 2020*, and *none ever* that involved any spread from providers to patients. (App.Vol.VI 1426-1427.) Meanwhile, out of approximately 37,000 people who work for Anschutz, Defendants' own data show it has achieved a 99.5%

However, her religious opposition to COVID vaccination remains, including to any "booster" requirements.

vaccination rate. (Id., 1427.) Thus, it strains credulity that exempting these 17 Plaintiffs—three of whom work entirely off-campus—would pose a "grave threat" to the Anschutz community.

This is additionally confirmed by the fact healthcare facilities across Colorado—and in nearby states—have granted medical and religious exemptions to hundreds of employees and/or students without impeding efforts to slow the spread of COVID. Indeed, aside from the 1,100 exemptions granted by UC Health (where members of the Anschutz community frequently work), Defendants have never addressed Plaintiffs' "Group Exhibit" with the declarations of 31 exemplary health care witnesses around the country who have received religious accommodations and have continued to provide critical care services. (App.Vol.V 1177–1238.)

Plaintiffs also presented unrebutted evidence that the University of Nebraska Medical Center in Omaha, Nebraska—a similarly situated medical school campus in a neighboring state, with the same interest in protecting vulnerable patients from COVID and its effects—granted religious exemptions from its COVID vaccination mandate to a total of nearly 200 students and employees last fall, (App.Vol.IV 988–1004), with no news of a COVID crisis in the time since then.

The Colorado State Board of Health's vaccine mandate policy is similarly flexible. While the Board initially required facilities to seek waivers from its 100%

vaccination requirement to grant religious exemptions, the Board now positively counts religious exemptees *toward* the 100% vaccination requirement, without need for any Board approval.[11] Defendants denigrate the same religious rights that the State Board of Health honors across Colorado.

Moreover, the evidence below highlighted data showing that initial vaccination without boosters is statistically ineffective against the Omicron variant. (App.Vol.V 1447–1448.) Recent studies show that vaccine effectiveness against the transmission of the Omicron variant, without a booster shot, is *as low as 0% to 20%*. (Id., 1447.) Other experts, too, acknowledge that the original COVID vaccine regimen is increasingly *ineffective* at stopping COVID-19 transmission,[12] even as they acknowledge that readily available alternatives are *effective* at reducing risk.[13] Booster-shot effectiveness has also become suspect, as one of Defendants' experts

---

[11] David Gartenberg and Laura Spector, "Colorado's Vaccine Mandate for Healthcare Providers Remains in Effect Despite Stays to CMS Vaccine Mandate," Littler, Dec. 15, 2021, https://www.littler.com/publication-press/publication/colorados-vaccine-mandate-healthcare-providers-remains-effect-despite.

[12] *See, e.g.*, Elie Dolgin, "Omicron thwarts some of the world's most-used COVID vaccines," Nature, Jan. 13, 2022, https://www.nature.com/articles/d41586-022-00079-6; CDC, COVID-19, *Omicron Variant: What You Need to Know* ("[A]nyone with Omicron infection can spread the virus to others, even if they are vaccinated.").

[13] CDC, COVID-19, *Types of Masks and Respirators – Summary of Recent Changes*, Jan 28, 2022 ( "Masks and respirators are effective at reducing transmission of SARS-CoV-2 . . . when worn consistently and correctly," and N95 masks "filter at least 95% of particles in the air"), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html.

in this litigation, Dr. Jonathan Samet, M.D., recently admitted that vaccine effectiveness "drops off about 10 weeks after a *third* dose of the mRNA vaccine." (App.Vol.VI 1448, ¶22.)

Despite the evidence showing that a booster shot is absolutely required to (even arguably) prevent transmission of the dominant Omicron variant, Defendants lifted their booster requirement just two weeks ago, conceding the "continued decline in COVID-19 cases, test positivity rates in the Denver metro area and across our state," coupled with the "high level of vaccination among our students and employees" and "high levels of immunity among Coloradans at this time."[14] In light of this admission, along with the presence of numerous un-boosted Anschutz students and employees allowed to continue studying and working in person, it again strains credulity to think Defendants have *any* interest, let alone a compelling one, in continuing to bar the campus doors (or *other* hospitals' doors) to these Plaintiffs. By this point in the pandemic, at the very least, the First Amendment requires far more.

### F. Procedural History.

Dr. Jane Doe 1 and John Doe 1 began this lawsuit on September 29, 2021, seeking a temporary restraining order and preliminary injunction against the

---

[14] Chancellor Elliman Communiques, COVID-19 on Decline (Feb. 18, 2022), https://www.cuanschutz.edu/about/leadership/chancellor/communiques/updating-campus-protocols-with-covid-19-on-decline.

application of the September 1 Policy under the First Amendment. (App.Vol.I 29, 188–196.) Neither they nor their counsel were notified of the newly adopted September 24 Policy at the time, despite undersigned counsel's conferral with University counsel on September 28. (Id., 189–191.) In lieu of TRO proceedings, Defendants agreed to place Dr. Jane Doe 1 on paid administrative leave pending the outcome of the preliminary injunction motion. (App.Vol.V 1045, n.10.) The district court ultimately denied the motion on October 25 ("October Order"), holding that "*Plaintiffs have not shown* their claims are not moot," since "there is no indication . . . that Defendants might reinstate the September 1 Policy." (App.Vol.III 625, Or. 2-3.) The district court refrained from opining on the September 24 Policy until the plaintiffs formally challenged it in amended pleadings. (Id.,) The two plaintiffs timely appealed. (App.Vol.V 1259.)

On November 2, 2021, Plaintiffs filed a Renewed Motion for Preliminary Injunction against both the September 1 and September 24 Policies, based on a Verified Amended and Supplemental Complaint adding new claims and 16 new Plaintiffs. (App.Vol.III 629–868; App.Vol.IV 968–1005.)

The district court denied their renewed motion for preliminary injunction on January 27, 2022 ("January Order"). (App.Vol.VII 1663-1675, Attachment 2.) The district court again held that challenges to the September 1 Policy were moot. (Id., Or. 4–5.)

Additionally, the district court held the September 24 Policy is a neutral

burden on Plaintiffs' religious exercise, ruling in part that the fact the University

"amended its policies while navigating a monthslong global pandemic does not

show that its reasons for denying religious exemptions for students are pretextual."

(Id., Or. 8.) It also ruled that the Policy is generally applicable and satisfies rational

basis scrutiny. (Id., Or. 10-11.)

Finally, the Court held that any harm suffered by the Plaintiffs as a result of

their religious beliefs was "not of a constitutional dimension," and thus that

Plaintiffs are not entitled to an injunction.  (Id., Or. 12-13.) Plaintiffs timely

appealed. (App.Vol.VII 1676.)

Plaintiffs then moved the district court for an injunction pending appeal

(App.Vol.VII 1677-1687), which it denied on February 3. (App.Vol.VII 1688.) On

the same day, this Court granted Plaintiffs' unopposed motion to consolidate the

two aforementioned appeals. (Doc. No. 010110640819.) Defendants have since

moved to dismiss Case No. 21-1414 as moot, but that motion has been referred to

this panel. (Doc. No. 010110652793.)

Plaintiffs then filed a motion for injunction pending appeal, or for an

expedited appeal, with this Court on February 11, and that motion remains

pending. (Doc. 010110644449.) On March 3, this Court ordered Defendants to file

a surreply explaining whether the University has changed its policy "or whether

persons have otherwise been granted exemptions to work or study in-person" at Anschutz, after Plaintiffs' reply memorandum noted that a recent announcement by Chancellor Elliman implied that some unvaccinated students or employees have received exemptions for in-person work. (Case Nos. 21-1414 and 22-1027, Doc. No. 010110652198.) Defendants replied in the negative, stating that anyone with patient-care responsibilities or whose work or studies require in-person interaction on campus must still be vaccinated (but not boosted), except for "the very limited group of people" like John Doe 4 who are "accommodated," for medical or religious reasons, by "fully isolat[ing]" from other human beings on campus. (Case Nos. 21-1414 and 22-1027, Doc. No. 010110654459, p. 4, n. 3.)

Notably, Defendants' surreply included a "Second Declaration" from Chancellor Elliman. (Doc. No. 010110654461, Ex. BB.) The declaration avers that Defendants' removed "certain language governing religious exemptions" from the September 1 Policy solely because it "rendered the policy vulnerable to challenge," still refusing to recognize that it flagrantly demeans Anschutz students and employees with religious objections to COVID vaccines—presuming their sincerely held religious beliefs to be *illegitimate* in the putatively "neutral" eyes of the University. (Id. at ¶11.)

## STANDARD OF REVIEW

This Court reviews a denial of preliminary injunction for abuse of discretion, which "occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Fisch v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). The district court's fact findings are reviewed for clear error and its conclusions of law de novo. *Id.* In "First Amendment case[s]," this Court is "obligated to independently review the factual record to ensure that the [district] court's judgment does not unlawfully intrude on free [exercise of religion]." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-49 (2000).

## SUMMARY OF ARGUMENT

Contrary to the district court's rulings, Plaintiffs' challenges to the September 1 Policy are not moot, and the September 24 Policy is not a neutral and generally applicable burden on Plaintiffs' religious exercise and cannot survive constitutional scrutiny. Plaintiffs are suffering irreparable harm, and the equities strongly favor granting their renewed motion for preliminary injunction.

The challenges to the September 1 Policy are not moot because that policy has present-day effects on each Plaintiff, and prospective relief is available since Plaintiffs also seek an injunction against the September 24 Policy and restoration to their pre-September 1 positions. Moreover, Jane Does 2 and 9 were forced out solely under the September 1 Policy without being reconsidered under the

September 24 Policy, and thus the September 1 Policy remains the only source of their ongoing irreparable harm.

As to the merits, the September 24 Policy is not religiously neutral on its face or as applied because: (a) it singles out student religious objections for disfavored treatment by expressly disqualifying them from exemption; (b) its historical background and continuity with the September 1 Policy in time, rationale, and effect raises far more than the strict-scrutiny-triggering "slight suspicion" that the September 24 Policy is likewise predicated on distrust of Plaintiffs' religious practices; and (c) Defendants effectively acknowledged they exterminated previously allowed medical exemptions to avoid accommodating Plaintiffs' religious exercise.

The September 24 Policy is also not generally applicable because: (a) Defendants' practice of allowing medical but not religious exemptions is not moot, and it permits comparable activity for secular reasons that triggers strict scrutiny; (b) Defendants permit employees and students to work at affiliate sites that grant exemptions to non-Anschutz employees in direct contravention of Defendants' core assertion that any unvaccinated worker poses an unacceptable threat to Anschutz students and employees; (c) Defendants allow un-boosted students and employees to continue in-person activities despite the documented lack of effectiveness of one- or two-shot regimens against the currently dominant Omicron

variant; and (d) Anschutz patients need not be vaccinated despite posing similar (and likely greater) risks to Defendants' interests than these 17 Plaintiffs.

Thus, the September 24 Policy must undergo strict scrutiny, which it cannot survive because: (a) Defendants lack a compelling interest in applying the mandate to these Plaintiffs, since their own expert acknowledges that vaccine alternatives have been "quite effective" at preventing COVID at Anschutz, and Plaintiffs worked carefully and heroically throughout the pandemic without causing any COVID outbreaks or disruptions in healthcare; and (b) denying Plaintiffs religious exemptions is not the least restrictive means in part because many health care systems in Colorado and across the country have granted numerous religious exemptions with no signs of causing any harm.

The September 24 Policy also fails rational basis scrutiny given that three of these Plaintiffs work entirely off campus, including two who were eligible for or actually received religious exemptions from their physical places of work, and given that Anschutz employees and students may freely work among the unvaccinated at affiliate sites despite Defendants' assertion that any unvaccinated healthcare worker allegedly poses an unacceptable threat to the Anschutz community.

Plaintiffs have thus made a strong showing that they're likely to succeed on their First Amendment claim.

Plaintiffs are therefore suffering irreparable harm, and because there is no evidence that granting them religious exemptions will cause any harm (and indeed would only help remedy ongoing healthcare staffing shortages) the equities strongly favor granting Plaintiffs' renewed motion for preliminary injunction.

## ARGUMENT

Plaintiffs-Appellants are in need of preliminary injunctive relief to stop Defendants' ongoing violations of their fundamental rights as guaranteed by the First Amendment's Religion Clauses. Under the traditional standard for obtaining a preliminary injunction, Plaintiffs must show: (1) likelihood of success on the merits, (2) a likely threat of irreparable harm, (3) the harm to movants outweighs the harm of injunction on the non-movants, and (4) an injunction is consistent with the public interest. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub. nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Where, as here, Plaintiffs seek a mandatory injunction requiring Defendants to take affirmative steps restoring the status quo, they must make a "strong showing" that they're likely to succeed on the merits and the balance of harms weighs in their favor. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1261 (10th Cir. 2005). In light of the egregious constitutional violations committed by Defendants against them here, Plaintiffs easily meet this test.

I.     **Plaintiffs Have Made a Strong Showing They Are Likely to Succeed on Their First Amendment Claims.**

A.     **Plaintiffs' challenges to the September 1 Policy are not moot.**

These challenges are not moot given that the September 1 Policy has lingering, present-day effects on each Plaintiff, and prospective relief remains available because Plaintiffs also seek relief against the September 24 Policy and restoration of the status quo. Additionally, the September 1 Policy remains the sole ongoing source of harm to Jane Does 2 and 9, who were forced out of the University under that policy alone and were never re-evaluated under the September 24 Policy.

"The burden of demonstrating mootness is a heavy one." *Rezaq v. Nalley*, 677 F.3d 1001,  1008 (10th Cir. 2012). And it is "[t]he party arguing in favor of mootness" who "bears the burden to show the case is moot." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 878 (10th Cir. 2019).

The district court's October Order plainly violated this standard by requiring Plaintiffs to show *non*-mootness, twice holding that "Plaintiffs have not shown," and Plaintiffs "fail[ed] to make a threshold showing," that their case is not moot. (Attachment 1, Or. 3.)

Further, "[a] claim is moot when a plaintiff loses a personal stake in the outcome because of some intervening event." *Equal Emp. Opportunity Comm'n v.*

33

*CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173 (10th Cir. 2017). "In assessing mootness, we consider whether a favorable judicial decision would have some effect in the real world." *Id*. Critically, while "[p]ast exposure to illegal conduct does not in itself [establish] a present case or controversy regarding injunctive relief," a "case is not moot if the [government] made decisions under the old policies that have ongoing, long-term consequences for the plaintiffs that could be mitigated by an award of prospective relief." *Rezaq*, 677 F.3d at 1008.

In *Rezaq*, four convicted terrorists were transferred to the highest maximum security prison in the federal system located in Florence, Colorado ("Max"), without due process of law. *Id.* at 1005. When the prisoners sued, the government issued revised procedures and conducted retroactive hearings—each resulting in continued recommended placement at Max. *Id.* at 1006. During the course of litigation, each plaintiff was transferred to an intermediate-security prison, though still more severe than their *pre*-Max placements. *Id.* at 1005.

The government argued the *Rezaq* plaintiffs' adapted challenges to the retroactive hearing procedures were moot, since they had all been transferred out of Max anyway, and entirely new policies had taken effect. *Id.* at 1008. This Court disagreed, noting the government "place[d] undue focus on the policies themselves, which detracts from the real issue: whether the [government] has sufficiently mitigated the effects of any harm caused by the old policies." *Id.* at

1009. The Court then held that plaintiffs' challenges were not moot for two reasons: first, their ultimate transfers to intermediate facilities did not "completely and irrevocably eradicate the effects of the alleged violation" because they were never returned to their *pre*-Max placements, which was the relief they sought; and second, "some prospective relief remains available" because if the government's retroactive hearing procedures were also unconstitutional, "this Court could award meaningful relief in the form of additional process"—even if the relief is only "partial," and even if it is "unlikely to result in less-restrictive conditions, it is relief nonetheless." *Id.* at 1009–1010 (cleaned up).

In like manner, here the district court placed undue focus on Defendants' policies themselves in holding that challenges to the September 1 Policy were moot "in light of the superseding September 24 Policy," (Attachment 1, Or. 2–3), and because "there is no argument or evidence that the September 1 Policy continues to be in effect or is likely to be reinstated" (Attachment 2, Or. 5.) Additionally, the September 24 Policy did not "completely and irrevocably eradicate the effects of the" September 1 Policy, because it did not return Plaintiffs to their pre-September 1 status quo (indeed, they were all fired, forced to leave, or forced to work in isolation or remotely away from their colleagues). Finally, prospective relief remains available because if the *September 24 Policy* is also deficient, this Court can award at least some additional relief in the form of a

constitutionally compliant religious exemption process, or even full exemption as Plaintiffs seek. Thus, because Plaintiffs are challenging both the September 1 *and* September 24 Policies, thereby seeking restoration to their *pre*-September 1 placements,[15] their challenges to the September 1 Policy is not moot.

This is all the more true for Plaintiffs Jane Does 2 and 9, whom Defendants admit have never been re-evaluated under the September 24 Policy. (App.Vol.VI 1277, n.18.) That policy thus remains the exclusive source of their ongoing harms, rendering their challenges to it plainly not moot. *See Smith v. Allen*, 502 F.3d 1255, 1268 (11th Cir. 2007) ("In this case, it is not a question of whether the denial of Smith's [religious] crystal" in prison "is reasonably likely to occur in the future . . . Rather, the conduct at issue is occurring at present, since Smith remains subject to the 2003 denial of his crystal"), overruled on other grounds by *Hoever v. Marks*, 993 F.3d 1353 (11th Cir. 2021), and abrogated on other grounds by *Sossamon v. Texas*, 563 U.S. 277, 131 S. Ct. 1651 (2011)).

Thus, Plaintiffs' challenges to the September 1 Policy are not moot.

**B.      Defendants' Actions Under the September 1 and September 24 Policies Flagrantly Violate the First Amendment's Religion Clauses.**

---

[15] Indeed, the six Plaintiffs who were ultimately allowed to work remotely or in isolation all sought restoration to their status quos. (*E.g.*, App.Vol.V 1019, ¶¶155-56, 165-66, 176-77) (stating "fully remote" work "does not allow . . . vital skill-development . . . necessary . . .  to perform [their] work").

36

The September 1 Policy, and Defendants' vigorous application of it, violates the First Amendment for reasons that should be obvious at this point. *See Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (Colorado "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs or practices"); *see also Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021) ("Government fails to act neutrally when it . . . restricts practices because of their religious nature."); *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (invalidating similar COVID vaccine exemption process in New York City because "[d]enying an individual a religious accommodation based on someone else's public express religious views—even the leader of her faith—runs afoul of the Supreme Court's teaching that '[i]t is not within the judicial ken to question . . . the validity of particular litigants' interpretation of those creeds.'").[16]

But the September 24 Policy, too, violates the First Amendment under both the neutrality and general applicability prongs of the well-trodden *Smith* doctrine, contrary to the district court's January Order.

---

[16] Thus, Jane Does 2 and 9 have made a "strong showing" they are likely to prevail on the merits because their ongoing harms arise exclusively from the September 1 Policy.

37

**1.    The September 24 Policy is not neutral with respect to religion.**

*a.  The Policy expressly singles out students with religious objections for disfavored treatment.*

The September 24 Policy singles out student religious objections for disfavored treatment because it makes *express* religious discrimination against students a means to Defendants' end of achieving total vaccination at Anschutz.

Laws that facially "single out the religious" for disfavored treatment, "clear[ly] . . . impose[] a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2021, 2021-22 (2017); *see also Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020) ("laws that impose special disabilities on the basis of religious status" trigger strict scrutiny). Further, "[a] law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). The September 24 Policy plainly fails this test.

On its face, Defendants' September 24 Policy expressly targets students' religious beliefs for disfavored treatment, providing that "*[r]eligious accommodations are not currently available to students or applicants,*" while at the same time allowing students to apply for "medical accommodations," and allowing employees to apply for both medical and religious accommodations. (App.Vol.V

1255-56.) *See First Baptist Church v. Kelly*, 455 F.Supp.3d 1079, 1088-89 (D.

Kan. 2020) (COVID-related executive orders providing that "their prohibitions

against mass gatherings apply to 'churches or other religious facilities'" thus

"expressly target religious gatherings on a broad scale and are, therefore, not

facially neutral").

Indeed, recently seven judges of the Ninth Circuit opined that a similar

policy by the San Diego Unified School District—one "*expressly* forbid[ding]

exemptions for religious students" from its COVID-19 vaccine mandate while

allowing religious exemptions for employees—"*expressly* targets the religious for

worse treatment in direct violation of Supreme Court precedent." *Doe v. San Diego

Unified Sch. Dist.*, 22 F.4th 1099, 1103 (9th Cir. 2022) (Bumatay, J., dissenting

from denial of rehearing en banc) (emphasis in original). As those judges

explained: "When government calls out religion *by name*, that is a clarion sign that

we are not dealing with a neutral and generally applicable law," and shows that the

government is "target[ing] religion for differential treatment." *Id.* (emphasis in

original); *accord S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716,

717 (2021) (Statement of Gorsuch, J.) (California's COVID restriction "obviously

targets religion for differential treatment" by "openly impos[ing] more stringent

regulations on religious institutions than on many businesses," and "assign[ing]

places of worship their own [category].").

The district court deemed the September 24 Policy neutral because it allegedly follows Title VII, "which protects [employees] but not [students]." (Attachment 2, Or. 9 (citing *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021), *reconsideration en banc denied*, 22 F.4th 1099 (9th Cir. 2022)).) It also held the September 24 Policy does not "restrict any practices because of their religious nature," because it doesn't evince an "aim of suppressing religious belief, rather than [one of] protecting" others' health. (Attachment 2, Or. 7-8.) But as the seven Ninth Circuit judges recently put it, "[i]f the staff exemption is consistent with the [school's] interest in the health and safety of its campuses, it strains credulity to believe that [it] could not offer the same for its students." *Doe*, 22 F.4th 1099, 1108 (Bumatay, J., dissenting).

Additionally, this Court has previously recognized that governments cannot make "religious discrimination . . . the means to an entirely secular end," *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1144 (10th Cir. 2006)—here, complying with Title VII and campus "health."

In *Shrum*, this Court recognized a First Amendment cause of action where the plaintiff officer claimed the police chief "wanted to force [him] out" of the police department (purportedly for underperforming) and thereby required him to work on Sundays, thus knowingly interfering with his previously accommodated role as a Christian minister and "making him choose between his duties as a police

officer and his duties as a minister." *Id.* at 1144; *see also id.* at 1144-45 ("[T]he Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise . . . for secular reasons, such as saving money, promoting education, obtaining jurors, maintaining morale on the police force, or protecting job opportunities.") (internal citations omitted).

Here, the September 24 Policy *expressly* makes a student's religious objection to COVID vaccination the means by which Defendants are allegedly following Title VII and ensuring total student vaccination at Anschutz—*expressly* "making [students] choose between [their] duties as a [student] and [their] duties as [religious believers]." *Shrum*, 449 F.3d at 1144. Thus, Defendants' *secular* ends for engaging in express religious discrimination do not immunize the Policy's violation of facial neutrality.

> b. *The September 24 Policy's continuity with the September 1 Policy also belies its neutrality.*

The September 24 Policy is also not neutral as applied to any Plaintiff here given its manifest continuity with the September 1 Policy, including in time, rationale, and effect. Indeed, the September 24 Policy is so connected with its predecessor that for months Defendants didn't even bother to apply it to Plaintiffs.

Even if a religion-burdening rule is facially neutral, courts must "survey meticulously" the direct and circumstantial evidence and determine if it nonetheless targets religion. *Lukumi*, 508 U.S. at 534. "Relevant evidence includes

. . . the historical background of the [rule] under challenge, the specific series of events leading to [its] enactment . . . , and [its] legislative or administrative history." *Id.* at 541. Further, "the effect of a law in its real operation is strong evidence of its object." *Id.* at 535. Moreover, courts are to apply heightened scrutiny "upon even slight suspicion that proposals for state intervention stem from animosity to religion *or distrust of its practices*." *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 547).

In an analogous context, the Supreme Court recently held that Louisiana and Oregon laws allowing non-unanimous jury verdicts in criminal trials violated the Sixth Amendment, in part because these laws were originally adopted as means of racial discrimination. *Ramos v. Louisiana*, 140 S.Ct. 1390, 1391-95, 1410 (2020); *see also id.*, at 1410 (Sotomayor, J., concurring in part); *see also id.*, at 1417 (Kavanaugh, J., concurring in part).

In light of *Ramos*, Justice Alito recently observed that Montana's state constitutional bar on state aid to religious schools (i.e., those controlled even "in part by any church, sect, or denomination") must be read in light of the backdrop of "Blaine Amendments" in the late 19th Century, which explicitly barred aid "to Catholic and other 'sectarian' schools." *Espinoza*, 140 S. Ct. at 2268 (enjoining Montana's "no-aid" provision *as applied* to parents seeking participation in a publicly funded scholarship program to send their children to religious schools)

(Alito, J, concurring). Thus, in light of *Ramos*, Justice Alito concluded that the Montana rule's historical background, use of similar terms, and similar operational effects require its total invalidation under the First Amendment. *Id.* at 2271-2274 (Alito, J., concurring).

Here, the close nexus between the September 1 and 24 Policies easily gives rise to the suspicion that the September 24 Policy—which has the *same practical effect* as the September 1 Policy—is likewise predicated on the presumed *illegitimacy* of Plaintiffs' religious objections to COVID vaccination. Indeed, the September 24 Policy's religious exemption simply rephrases, *while accomplishing the same objective as*, its prior iteration in the September 1 Policy.[17] The University's own legal counsel acknowledged the September 1 Policy was effectively a *categorical prohibition on employee and student religious exemptions*, stating in an email in August 2021: "[T]he religious exemption applies to people whose religion precludes <u>all</u> vaccinations. I am unaware of a religion that only prohibits COVID 19 vaccinations." (App.Vol.V 1141 (emphasis in original).) But the September 1 Policy accomplished this effect by *presuming* that most religious believers cannot have *legitimate* religious objections to COVID vaccines.

---

[17] In mid-October, Chancellor Elliman admitted that no employees had received religious exemptions under either Policy. (App.Vol.II 313.) He didn't bother confirming the same respecting students because they were categorically forbidden under the September 24 Policy, and it went without saying that they were all denied under the September 1 Policy.

*See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004) (finding

evidence of pretext despite facially neutral policy, based on defendants' past

"behavior," including that of a professor who said "other good Mormon" girls

didn't object to reading the required script).

Moreover, Defendants claim they adopted the Anshutz vaccine mandate to

be "consistent with the [Colorado] Board of Health's direction," which

"require[ed] that all staff in healthcare facilities, including students and trainees, be

vaccinated against COVID-19." (App.Vol.VI 1275-76.) But as mentioned, the

Board of Health allowed religious exemptions from the beginning, and it now says

religious exemptees *count towards* the 100% vaccination requirement.[18] As the

Second Circuit recently held, where "a regulation purports to implement a statute

whose text and history signal an intent for some accommodation of religious

beliefs," there is evidence of religious hostility "if agency actions afford[] no such

accommodation." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 166 (2d Cir.

2020) (reversing dismissal of Christian adoption agency's First Amendment claims

against New York regulation mandating participation in same-sex adoptions

against its religious beliefs). The same is true here with respect to Defendants'

alleged implementation of the Board's mandate.

---

[18] *See* Gartenberg, *supra*, n.11.

Further, Defendants adopted the September 24 Policy only in the wake of a threat of litigation (Doc. No. 010110654461, Ex. BB, Ex. BB, ¶11), yet they preserved the September 1 Policy's "operative core" and "function" (i.e., banning all religious exemptions in healthcare and other in-person settings). These are the very indicators that a facially neutral policy contains the discriminatory taint of its brazenly defective predecessor. *See* Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1190, 1225 (March 2022); *see also id.* at 1226 ("If the jeopardized policy is amended or 'replaced' with a policy that functions similarly, the intervening event of threatened litigation is a key piece of information binding the policies together.")

Additionally, Defendants continued to presume the illegitimacy of Plaintiffs' religious beliefs under the September 24 Policy, stating, for example, that Jane Doe 1 could not qualify for an exemption under that policy because "surely-she-must-know" that drugs like Tylenol and Aspirin are allegedly just as connected to abortion—even though they never bothered to talk to her about this outlandish falsehood or consider that those drugs were developed *in the 1800s* and are not intrinsically connected to abortion at all. (App.Vol.II 219, Vol. III 613, ¶¶28-29.)

In light of this evidence, there is more than a "slight suspicion" that the September 24 Policy contains the same "distrust" of Plaintiffs' "religious

practices" as the September 1 Policy. *See Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731. Therefore, it must undergo strict scrutiny.

> ### c. *Defendants plainly eliminated on-site medical exceptions to avoid accommodating Plaintiffs' religious practices.*

Finally, Defendants' revocation of all in-person *medical* exceptions in December 2021, on the eve of their response to Plaintiffs' renewed motion for preliminary injunction, was plainly executed "because of" Plaintiffs' religion and thus in further violation of religious neutrality.

In Defendants' opposition brief, they expressly relied on their last-minute crusade against medical exemptees in clinical settings (without citing any evidence they had caused any harm) as a key reason the September 24 Policy was now allegedly generally applicable, in response to Plaintiffs' argument that medical exemptees pose no less threat of spreading COVID in clinical settings as Plaintiffs. (App.Vol.VI 1298 (stating that elimination of medical exceptions in clinical settings means Plaintiffs are no longer treated more "harshly" than others there).) Thus, Defendants' late-arriving actions to level-*down* the playing field had the transparent "object" of continuing to suppress Plaintiffs' religious objections to COVID vaccination.[19] *Lukumi*, 508 U.S. at 533.

---

[19] *See* Mark C. Gillespie, *Level-Up Remedies For Religious Discrimination*, 44 Harv.J.L.P.P. 637, 961 (2021) (arguing that First Amendment presumptively requires "level-up" remedies for failure to provide equal treatment to religious exercise), https://www.harvard-jlpp.com/wp-

Accordingly, the September 24 Policy is not a neutral regulation of Plaintiffs' religious exercise and must undergo strict scrutiny.

### 2. The September 24 Policy is not generally applicable.

"A law [] lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's interests in a similar way." *Fulton*, 141 S. Ct. at 1877; *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (a law is not generally applicable where it "treat[s] *any* comparable secular activity more favorably than religious exercise") (emphasis in original). As the Supreme Court recently explained, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. Here, the September 24 Policy is not generally applicable for a number of reasons.

The September 24 Policy's stated purpose "is to protect the health and safety of the [Anschutz] community" from the spread of COVID-19, thus requiring students and employees whose activities "may require in-person interaction with" other Anschutz "employees, students, patients, study subjects, or members of the public, <u>regardless of location</u>, to become fully vaccinated against COVID-19." (App.Vol.V 1253.) In determining whether an exemption would pose an "undue

---

content/uploads/sites/21/2021/06/Gillespie-Level-Up-Remedies-for-Religious-Discrimination.pdf.

hardship" to this purpose, Defendants recently clarified that "for the University's purposes, an undue hardship is occasioned when an unvaccinated employee's duties would require in-person work, <u>since *unvaccinated individuals* threaten the health and safety of the University's patients, and other employees, students, and community</u>." (App.Vol.VI 1278.) But this purpose is undermined by a number of exceptions.

### (a) *Medical exceptions.*

As mentioned, Defendants allowed *medical* exceptions in clinical settings for almost the entire Fall 2021 semester—roughly a full year after COVID vaccines first became available—before revoking them on the eve of filing their last opposition brief below. (App.Vol.VI 1277, 1299.) These revocations were clearly a transparent attempt to *moot* Plaintiffs' claim that granting medical but not religious exceptions in clinical settings rendered the Policy non-generally applicable. *See, e.g.*, *Brown v. Buhlman*, 822 F.3d 1151, 1166 (10th Cir. 2016) ("[W]hen the defendant voluntarily stops the challenged conduct," the claim is moot only if it "is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," and "[i]nterim relief or events have completely and irrevocably eradicated the effects of the alleged violation"). Indeed, Defendants' total lack of evidence that previously authorized medical exemptees caused any harm confirms these revocations were just the kind of "gamesmanship"

and attempts to "evade judicial review" that the "voluntarily cessation" rule is designed to prevent. *Id*.

Thus, Defendants' months-long practice of allowing medical exemptions remains a valid comparator that plainly poses "similar risks" of spreading and contracting COVID as would-be religious exemptees. As three Justices of the U.S. Supreme Court recently put it: "Slice it how you will, medical exemptions and religious exemptions are on comparable footing when it comes to the State's asserted interests." *Does 1-3 v. Mills*, 142 S. Ct. 17, 20 (2021) (Gorsuch, J., dissenting from non-merits denial of emergency injunctive relief); *see also Thoms v. Maricopa Cnty. Cmty. College Dist.*, No. 2:21-cv-01781, 2021 WL 5162538, at *10 (D. Ariz. Nov. 5, 2021) ("[I]f an accommodation is good enough for [medical] students with secular hardships such as illness or other issues, then the Constitution dictates, under these circumstances, that it is good enough for students with religious hardships.")

Defendants have argued they have granted only 18 temporary and 11 permanent medical exemptions, out of 74 total requests, whereas they have fielded more than 200 requests for religious exemption. (App.Vol.VI 1277.) The district court cited this argument in its January Order as allegedly key evidence of non-comparability, (Attachment 2, Or. 10-11), but as Justices Gorsuch and Alito recently stated: the "general applicability test doesn't turn on this kind of numbers

game. . . . [rather,] rights belong to individuals," and "the relevant question here involves a one-to-one comparison between the individual seeking a religious exemption and one benefiting from a secular exemption." *Dr. A. v. Hochul*, 142 S. Ct. 552, 556 (2021) (Gorsuch, J., dissenting from non-merits denial of emergency injunction). Thus, Defendants' practice of granting *some* medical but *zero* religious exceptions in clinical settings triggers strict scrutiny.

> *(b) Permission to work around unvaccinated staff at other sites.*

Defendants also allow vaccinated Anschutz staff and students to work at *affiliated sites with their own exemption policies*, and which sites are *actually granting* both religious and medical exemptions to their own staff.[20] Indeed, as noted, UC Health has "granted 1,100 medical or religious exemptions."[21] As well, Colorado Mental Health Institute at Pueblo (more than 100 miles from the Anschutz campus, where Jane Doe 11 exclusively worked) is granting religious exemptions to its own staff—including to Jane Doe 11 *herself* and to her own husband who also works there. Yet Defendants would readily allow Jane Doe 11 to continue working there, alongside her unvaccinated husband, if she submitted to vaccination. (App.Vol.VI 1441) (*See also* id. 1425-26 (Jane Doe 3 noting she has received an exemption from the VA Medical Center in her capacity as *a staff*

---

[20] *See* Gartenberg, *supra*, n.11.
[21] *See* Daley, *supra*, n.5.

*member there*, but Defendants are denying her an exemption to work at the same site in her capacity as *an Anschutz faculty member*).)

Accordingly, given that vaccinated Anschutz staff and students are free to work amongst so many unvaccinated individuals at other locations, it's difficult to take seriously Defendants' assertion that a categorical bar on religious exemptions for "in-person work" is necessary because "*unvaccinated individuals threaten the health and safety of the University's patients, and other employees, students, and community.*" (App.Vol.VI 1278.) This exception also easily triggers strict scrutiny.

### c. Un-boosted staff and students.

Now that Defendants have lifted their booster mandate, an innumerable amount of Anschutz's 37,000 employees are allowed to work in-person while "un-boosted" (as much as one year or more from their most recent COVID vaccination, which has been publicly available since December 2020). This despite indisputable evidence that the original one- or two-shot COVID vaccine regimen has a transmissibility effectiveness rate against the Omicron variant of *0% to 20%* at best. (App.Vol.VI 1447.) Pfizer's CEO even just announced that a *fourth* shot now "*is necessary*," stating "it's clear there is a *need* in an environment of omicron to boost the immune response" in order to maintain adequate protection against

COVID.[22] Thus, because those who have not even received a third shot are now allowed to continue working in-person and thus "*could* present similar risks" of contracting or spreading COVID as these 17 Plaintiffs, *see Tandon*, 141 S.Ct. at 1296 (cleaned up), the September 24 Policy's application to Plaintiffs must undergo strict scrutiny.

### d. Patients.

Finally, Defendants have no rule prohibiting unvaccinated *patients* from being treated by members of the Anschutz community, and Defendants acknowledge that "fully 84% of those who are hospitalized due to COVID-19 are unvaccinated." (App.Vol.VI 1275.) These patients are just as capable as Plaintiffs of infecting other immuno-compromised patients or staff—thus undermining the precise interest used to justify denying exemptions to Plaintiffs.[23]

In light of all these exceptions, the September 24 Policy is also non-generally applicable and must undergo strict scrutiny for this reason, too.

### C. The September 24 Policy easily fails strict scrutiny.

To satisfy strict scrutiny, Defendants must demonstrate a compelling interest "in denying an exception" to "*particular* religious claimants." *Fulton*, 141 S. Ct. at 1882. And it must show the restriction "is the *least restrictive means*" of achieving

---

[22] Joseph Choi, "Pfizer CEO says a fourth booster shot 'is necessary,'" The Hill, March 13, 2022 (emphasis added), https://thehill.com/policy/healthcare/598026-pfizer-ceo-says-a-fourth-booster-shot-is-necessary.
[23] *Supra* n.7.

that interest. *Thomas v. Rev. Bd. of Indiana Sec. Div.*, 450 U.S. 708, 718 (1981). Defendants clearly fail both prongs.

Notably, "government does not have a compelling interest in each marginal percentage point by which its goals are advanced," and its "curtailment of free [exercise] must be actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799, 803 n.9 (2011). But here Defendants' own expert has acknowledged PPE "has been quite effective in preventing the spread" of COVID. (App.Vol.VI 1345, ¶7.) Defendants simply argue PPE and the like "are less effective" (Id. 1304), but, especially as the now-dominant Omicron variant infects the vaccinated and unvaccinated at similar rates,[24] that is exactly the kind of marginal difference that doesn't justify restricting First Amendment rights.

Moreover, many of these Plaintiffs worked heroically on the front lines of healthcare through 18 months of the pandemic—including during the wide availability of COVID vaccines for nearly a year—without *ever* spreading COVID to patients or causing any disruptions to healthcare whatsoever. (App.Vol.VI 1426-27.) Relatedly, the Fifth Circuit recently recognized that the Navy can have no compelling interest in denying religious exemptions to 35 Special Warfare servicemembers with religious objections to the vaccine given, in part, that "multiple Plaintiffs successfully deployed overseas before and after the vaccine

---

[24] *See* Dolgin, *supra* n.12.

became available, and one even received" an award for "safely navigating restricted movement and distancing requirements" while on deployment, and many also trained Navy SEALS for deployments despite being unvaccinated. *U.S. Navy Seals 1-26 v. Biden*, No. 22-10077, 2022 WL 594375, at *12 (5th Cir. 2022).[25]

Similarly here, for example, Dr. Jane Doe 1's direct supervisor praised her for "dutifully wear[ing] PPE . . . , clean[ing] workstations and phones, and follow[ing] all other infection control measures," and for treating patients with the kind of dignity that the entire staff should seek to emulate. (App.Vol.III 617–618.) Clearly Defendants lack a compelling interest in forcing her, or any other Plaintiff for whom "there [is] no evidence that [they] have contributed to the spread of COVID-19," to vaccinate. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

Further, government "must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297. But Defendants have not, and cannot, show that these Plaintiffs are more dangerous than the secular exemptions they already allow. Clearly medical exceptions, in-person work alongside unvaccinated healthcare

---

[25] The Biden Administration is seeking a limited temporary stay of this decision to prohibit the plaintiffs from being deployed, while allowing them to remain in the Navy. *See Austin v. U.S. Navy Seals 1-26*, App. 21A477, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/21a477.html.

workers at affiliate sites, widespread un-boosted work and study, and unvaccinated patients are no less dangerous than this handful of unvaccinated Plaintiffs who are dispersed throughout the Anschutz community and could just as easily exercise the same alternative precautions.

*Even if* Defendants had a compelling interest, for similar reasons they cannot "show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandon*, 141 S. Ct. at 1296-97. That includes "show[ing] that [they] considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). From the foregoing, Plaintiffs are obviously aware that hospitals around the country and in Colorado, including *those affiliated with Anschutz itself*, are freely allowing religious and medical exemptions for healthcare workers in clinical settings, without any evidence of resulting COVID spread or undermining of effective health care. Indeed, as Plaintiffs have noted, in a neighboring state, the University of Nebraska Medical Center granted religious exemptions from its COVID vaccine mandate to nearly 200 students and employees. (App.Vol.IV 989.) *See Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 735 (6th Cir. 2021) (university's denial of religious exemptions to plaintiff students not narrowly tailored where "several other universities grant exemptions from their COVID-19 mandates").

Thus, the September 24 Policy cannot survive strict scrutiny, and Plaintiffs have thereby made a strong showing that they are likely to succeed on the merits.

### D.    The September 24 Policy also fails rational basis review.

This is the rare case where the government's policy also fails rational basis review under *Smith* as it tramples on religious exercise, especially as to the Plaintiffs who work entirely off campus. That's because "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1033 (10th Cir. 2007).

Here, classifying Jane Does 1 and 11 in the same category as unvaccinated employees who work on Anschutz's campus is entirely attenuated from the Policy's goal, which is purportedly "to protect the health and safety of the University of Colorado *Anschutz Campus ('CU Anschutz') community*." (App.Vol.V 1253.) While the Policy interest also extends to staff who work "off campus in connection with CU Anschutz programs," (id.), Jane Does 1 and 11 work *exclusively* off campus and were eligible for exemption or actually exempted, respectively, at their actual places of work. (*See supra*.) Thus, Defendants' "decision to deny a religious exemption in these circumstances borders on the irrational." *Does 1-3*, 142 S. Ct. at 22 (Gorsuch, J., dissenting from non-merits

denial of emergency injunction pending appeal).[26] Indeed, it's plainly irrational here.

Moreover, given that vaccinated students and employees may work shoulder-to-shoulder with unvaccinated workers at affiliated sites, and now that un-boosted staff and students are indefinitely permitted to remain on campus, there is no rational connection between requiring that *these 17 Plaintiffs* succumb to initial vaccination and the Policy's justification that "unvaccinated individuals threaten the health and safety of the University's patients, and other employees, students, and community." (App.Vol.VI 1278.)

Thus, the September 24 Policy also fails rational basis review.

## II. Plaintiffs Are Suffering Irreparable Harm and the Equities Strongly Favor a Preliminary Injunction.

### E. Irreparable harm.

The Tenth Circuit recognizes that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fisch*, 840 F.3d at 752. In light of their flagrant violations of Plaintiffs' First Amendment rights, Defendants "assuredly inflict[ed] irreparable harm" here.

---

[26] Although Plaintiffs did not raise this argument below, the district court stated it had "no trouble finding that" the September 24 Policy satisfies rational basis scrutiny, (Attachment 2, Or. 6), and this argument easily fits the waiver "exception" since it "involves a pure matter of law and the proper resolution of the issue is certain," and "injustice might otherwise result." *United States v. Jarvis*, 449 F.3d 1196, 1201-02 (10th Cir. 2007).

*Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020). Additionally, in these circumstances "it is not clear at all who would pay" Plaintiffs' economic damages, as "sovereign immunity would likely prevent Plaintiffs from obtaining money damages from the State." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021). Although Plaintiffs are pursuing damages against individual Defendants in their personal capacities, Plaintiffs' loss-of-employment and -academic-status damages as a result of the September 1 and 24 Policies are also manifestly irreparable.

### F.     Public Interest and Balance of Harms.

These two factors merge when the defendant is the government, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and they decidedly favor an injunction here. Indeed, "it is always in the public interest to prevent a violation of a party's constitutional rights." *Hobby Lobby Stores*, 723 F.3d at 1115. Additionally, Defendants' own expert admits PPE "has been quite effective" at stopping COVID. (App.Vol.VI 1345, ¶7.) And through two years of COVID there has been no reported viral spread from providers to patients by anyone in the Anschutz community, and no reported COVID transmissions *at all* within Anschutz since *December 2020*. (App.Vol.VI 1425-26.) In fact, the record shows that firing religious objectors only exacerbates staffing shortages and undermines patient care, (*see* App.Vol.III 617–618), which is a problem that has plagued Colorado

throughout the pandemic.[27] Thus the equitable factors heavily favor an injunction here.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and grant Plaintiffs-Appellants' renewed motion for preliminary injunction.

Respectfully submitted,

*/s/ Peter Breen*
Peter Breen
Martin Whittaker
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org

*/s/ Michael G. McHale*
Michael G. McHale
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132

---

[27] *See* John Daley, "Colorado patients and providers alike are frustrated, angry and worried as COVID cases pack hospitals across the state," CPR News, Dec. 9, 2021, https://www.cpr.org/2021/12/09/colorado-covid-cases-hospitalizations-staffing-shortage/.

775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs-Appellants*

**Reason Oral Argument is Necessary**

Oral argument is necessary due to the complexity and importance of the constitutional issues involved, including the application of multiple First Amendment and justiciability principles to 17 different Plaintiffs, all of whom are suffering ongoing irreparable harm.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.     This document complies with the type-volume limitation of Fed. R. App. P. 32(a) because, excluding the parts of the brief exempted by Fed. R. App. P. 32, this brief contains 12,882 words.

2.     This document complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(7) because this document has been prepared using Microsoft Word in 14-point Times New Roman font.

/s/ Michael McHale

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on March 14, 2022, via

CM/ECF on all counsel of record.

/s/ Michael McHale

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Raymond P. Moore**

Civil Action No. 21-cv-02637-RM

JANE DOE, M.D., and
JOHN DOE,

      Plaintiffs,

v.

UNIVERSITY OF COLORADO,
DONALD ELLIMAN, Chancellor of the University of Colorado Anschutz School of Medicine,
in his official capacity, and
SANTA ZIMMER, M.D., Senior Associate Dean of Medical Education, University of Colorado
Anschutz School of Medicine, in her official capacity,

      Defendants.

---

## ORDER

---

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order and a
Preliminary Injunction (ECF No. 2). After the parties informed the Court they had reached
agreement with respect to Plaintiffs' request for a temporary restraining order, the Court deemed
that request withdrawn, and briefing on the request for a preliminary injunction proceeded.
(*See* ECF Nos. 15, 17.) For the reasons below, the Court now denies the requested preliminary
injunction.

## I.    LEGAL STANDARDS

To obtain injunctive relief, a plaintiff must establish "(1) a substantial likelihood of
prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the
threatened injury outweighs the harm that the preliminary injunction may cause the opposing

party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quotation omitted).  Because injunctive relief is an extraordinary remedy, the plaintiff's right to relief must be clear and unequivocal.  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).  If the injunction will (1) alter the status quo, (2) mandate action by the defendant, or (3) afford the movant all the relief that he could recover at the conclusion of a full trial on the merits, the movant must meet a heightened burden.  *Id.* at 1259.

## II.    BACKGROUND

Plaintiffs, a pediatric physician employed by Defendant University of Colorado and a medical student at the Anschutz School of Medicine, allege that they have sincere religious objections to the Covid-19 vaccines currently available to them.  Both requested and were denied religious exemptions from Defendants' vaccination policy which took effect on September 1, 2021.  However, unbeknownst to Plaintiffs when they filed their Complaint on September 29, Defendants repealed and replaced that policy on September 24.  In their Reply in support of their request for a preliminary injunction, Plaintiffs state that they "will amend their Complaint to reflect the new policy."  (ECF No. 17 at 5 n.5.)  Nonetheless, they maintain that they remain in need of an injunction on the September 1 policy, which caused Plaintiff Jane Doe to be placed on indefinite administrative leave and Plaintiff John Doe to take a leave of absence.

## III.   ANALYSIS

Plaintiffs seek a disfavored form of relief that would alter the status quo and mandate action by Defendants, and therefore they have a high burden to meet.  With respect to the September 1 policy, Plaintiffs have not shown that their claims are not moot in light of the

superseding September 24 policy. Unlike the restrictions on gatherings in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), that shifted depending on how an area was classified, there is no indication on the current record that Defendants might reinstate the September 1 policy as conditions related to the Covid-19 pandemic evolve. In light of Plaintiffs' failure to make a threshold showing as to mootness, the Court finds they have not shown a likelihood of success on the merits with respect to their claims premised on the September 1 policy.

With respect to the September 24 policy, the Court declines to attempt to ascertain what claims Plaintiffs wish to assert. In their Reply, they state they "will be imminently amending their complaint" and seek to "incorporate by reference the arguments in that impending motion." (ECF No. 17 at 9.) But the Court is not in the business of considering arguments that have not yet been made. Thus, with the case in its current posture, the Court finds Plaintiffs have not shown a likelihood of success on the merits with respect to their claims premised on the September 24 policy.

## IV.    CONCLUSION

Therefore, the Court DENIES Plaintiff's Motion (ECF No. 2) with respect to his request for a preliminary injunction.

DATED this 25th day of October, 2021.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Raymond P. Moore

Civil Action No. 21-cv-02637-RM-KMT

JANE DOES 1-11, and
JOHN DOES 1, 3-7,

      Plaintiffs,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO,
TODD SALIMAN, President of the University of Colorado, in his official capacity,
DONALD M. ELLIMAN, Chancellor of the University of Colorado Anschutz Campus, in his official and personal capacities,
SANTA ZIMMER, M.D., Senior Associate Dean of Medical Education, University of Colorado School of Medicine, in her official and personal capacities,
ERIC MEDIAVILLA, Associate Dean for Student Affairs, University of Colorado School of Dental Medicine, in his official and personal capacities,
ANN-MICHAEL HOLLDAND, Master of Science Program Director, Department of Anesthesiology, in her official and personal capacities, and
JOHN AND JANE DOES 1-9, members of the Vaccine Verify team, in their official and personal capacities,

      Defendants.

---

## ORDER

---

Before the Court is Plaintiffs' Renewed Motion for Preliminary Injunction (ECF No. 27). Defendants have filed a Response to the Renewed Motion (ECF No. 56), and Plaintiffs have filed a Reply (ECF No. 61). The Court denies the Renewed Motion for the reasons below.

## I.    LEGAL STANDARD

To obtain injunctive relief, a plaintiff must establish "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the

threatened injury outweighs the harm that the preliminary injunction may cause the opposing

party; and (4) that the injunction, if issued, will not adversely affect the public interest."

*Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016)

(quotation omitted).  Because injunctive relief is an extraordinary remedy, the plaintiff's right to

relief must be clear and unequivocal.  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir.

2005).  If the injunction will (1) alter the status quo, (2) mandate action by the defendant, or

(3) afford the movant all the relief that he could recover at the conclusion of a full trial on the

merits, the movant must meet a heightened burden.  *Id.* at 1259.

## II.      BACKGROUND

Plaintiffs are seventeen current and former employees and students at the University of

Colorado's Anschutz Medical Campus alleging that Defendants violated their rights by denying

their requests for religious exemptions from the University's Covid-19 vaccine mandate.[1]  They

proceed anonymously.  (*See* ECF No. 62.)  The two original Plaintiffs filed their original

Verified Complaint on September 29, 2021, challenging the University's September 1 Policy,

pursuant to which they were required to either be fully vaccinated against Covid-19 or receive an

approved exemption by September 1, 2021.  (*See* ECF No. 1-1 at 2.)  The September 1 Policy

provided that "[a] religious exemption may be submitted based on a person's religious belief

whose teachings are opposed to all immunizations."  (*Id.* at 3.)  The original Plaintiffs filed their

Motion for a Temporary Restraining Order and a Preliminary Injunction simultaneously with

---

[1] Plaintiffs now acknowledge that the University has since granted religious accommodations to six employee
Plaintiffs who are able to work remotely.  (ECF No. 61 at 16.)

their Verified Complaint but withdrew their request for a temporary restraining order the next

day.  Briefing on their request for a preliminary injunction proceeded.

Unbeknownst to Plaintiffs when they brought this lawsuit, the September 1 Policy had

been superseded by an amended policy, effective September 24, 2021.  With respect to religious

accommodations, the September 24 Policy provides, in pertinent part, as follows:

> A religious accommodation may be granted based on an employee's religious
> beliefs. . . .  A religious accommodation will not be granted if the accommodation
> would unduly burden the health and safety of other Individuals, patients, or the
> campus community.

> Religious accommodations are not currently available to students or applicants.

(ECF No. 15-11 at 4.)  Nonetheless, Plaintiffs continued to insist they were entitled to an

injunction on the September 1 Policy, arguing that "it's because of *that policy* that Dr. Jane Doe

remains on indefinite administrative leave with impending termination and Student John Doe has

been effectively expelled and cannot return unless he violates his sincerely held religious

beliefs."  (ECF No. 17 at 6.)

The Court denied Plaintiffs' request for a preliminary injunction enjoining enforcement

of the September 1 Policy on mootness grounds, citing the absence of any evidence that policy

might be reinstated.  (*See* ECF No. 21 at 2-3.)  The Court denied a preliminary injunction with

respect to the September 24 Policy because the operative Verified Complaint did not state any

claim premised on that policy.  (*Id.* at 3.)

Plaintiffs then filed their Renewed Motion, seeking an order enjoining Defendants from

enforcing either the September 1 or September 24 Policies and ordering them to grant Plaintiffs'

religious exemptions and to revoke the prior denials of their requests.  Plaintiffs' Verified

Amended and Supplemental Complaint added sixteen new Plaintiffs to the case as well as some

new Defendants.  Plaintiff John Doe 2 has since voluntarily dismissed his claims without prejudice (ECF No. 34), leaving seventeen Plaintiffs at present: thirteen current or former employees (including medical providers, one of whom was an original Plaintiff and is an intensive care pediatrician) and four current or former students.  Plaintiffs assert that Defendants' refusal to grant them religious exemptions violates of the Free Exercise and Establishment Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Americans with Disabilities Act ("ADA"), and the religious freedom clauses of the Colorado constitution.  (*See* ECF No. 30 at 73-82.)  With respect to the six employee Plaintiffs who have been granted religious accommodations, Plaintiffs assert that their claims are not moot because "they have not been granted *equal treatment* with similarly situated employees exempted for non-religious reasons, in accord with the First Amendment's requirement of *equal treatment* for religious believers."  (ECF No. 61 at 9.)

In their Response to the Renewed Motion, Defendants assert that they reconsidered each of the current employees Plaintiffs' requests for religious accommodation under the September 24 Policy.  (ECF No. 56 at 9.)  Defendants did not reconsider the requests by Jane Does 2 and 9, who had since resigned and been terminated, respectively.  The record contains letters from December 2021 to each of the remaining employee Plaintiffs explaining how their exemption requests were evaluated under the September 24 Policy.  The letters show that accommodations were approved for six employees (Jane Does 4 and 6 and John Does 3-5, 7) because they could perform their job duties remotely.  For those whose job duties could not be performed remotely, the letters informed the unvaccinated employee Plaintiffs that their interaction with patients, fellow faculty, and staff members would place those individuals' health

and safety at risk.  (*See, e.g.*, ECF No. 56-4.)  The letters further explained that transferring those

employees' job duties to other individuals "presents undue hardship to the University."  (*Id.*)  As

a result, Jane Does 1 and 11 were placed on paid leave (ECF Nos. 56-3, 56-9), Jane Doe 3 was

placed on unpaid leave (ECF No. 56-4), Jane Doe 5 was permitted to work remotely on a

temporary basis (ECF No. 56-6), and Jane Doe 10 was informed she would be placed on unpaid

leave for an additional thirty days after her previously approved parental leave ended, after

which she would be terminated (ECF No. 56-8).  Defendants did not reconsider the student

Plaintiffs' requests for religious exemptions because they are ineligible for religious

accommodations under the September 24 Policy.

## III.    ANALYSIS

In the Renewed Motion, Plaintiffs seek a preliminary injunction preventing Defendants

from enforcing their Covid-19 vaccine mandate "in any manner that violates Plaintiffs' rights

under the First and Fourteenth Amendments."  (ECF No. 27 at 1.)  The Court begins its analysis

by noting that Plaintiffs seek a disfavored injunction that would alter the status quo and mandate

action by Defendants, and therefore they have an especially high burden to meet.  *See Schrier*,

427 F.3d at 1259.

Next, the Court finds Plaintiffs have not shown they are entitled to injunctive relief in

connection with the September 1 Policy.  Plaintiffs appear to concede that the September 24

Policy amended and superseded the prior policy; nevertheless, they contend that such

amendment "did not moot the original harm inflicted by" the September 1 Policy.  (ECF No. 61

at 7.)  Even if that is so, there is no argument or evidence that the September 1 Policy continues

to be in effect or is likely to be reinstated.  With the case in its current posture, the Court finds

that enjoining Defendants from enforcing the September 1 Policy would have no effect in the real world.  *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1112 (10th Cir. 2010) (concluding that superseding biological opinion mooted environmental groups' prayer for injunctive and declaratory relief based on earlier opinions).  Because Plaintiffs have not established that enjoining Defendants from enforcing the September 1 Policy is necessary to prevent irreparable harm to them, the Court turns to weighing the injunction factors to determine whether Plaintiffs are entitled to injunctive relief in connection with the September 24 Policy.

### A.    Likelihood of Success on the Merits

The Constitution permits general regulations that incidentally burden religious practices. *See Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990).  "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  *Id.* (quotation omitted).  Accordingly, "a neutral law of general applicability is subject to rational basis review even if it incidentally burdens a particular religious practice." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021) (quotation omitted).

Plaintiffs have not argued that the September 24 Policy is not rational, and, in accord with other federal courts that have reached the issue, this Court has no trouble finding that it is. *See, e.g.*, *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021) ("Appellants do not argue that they are likely to succeed on the merits of their free exercise claim if rational basis review applies."); *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) ("The Vaccine Mandate plainly satisfies this [rational basis] standard."); *We The Patriots*, 17 F.4th at 290 ("This was a reasonable exercise of the State's power to enact rules to protect the public health.");

*Does 1-6 v. Mills*, 16 F.4th 20, 32 (1st Cir. 2021) ("Strict scrutiny does not apply here.  But even if it did, the plaintiffs still have no likelihood of success."); *Klaassen v. Trs. of Ind. Univ.*, --- F. Supp. 3d ----, 2021 WL 3073926, at *38 (N.D. Ind. July 18, 2021) ("No student, including those not yet exempt, ha[s] shown that Indiana University's vaccine mandate as applied to them violates rational basis review.").  Thus, to establish they are entitled to a preliminary injunction based on their constitutional claims, Plaintiffs must show they are likely to succeed in establishing that the September 24 Policy is not neutral and generally applicable.  *See Smith*, 494 U.S. at 879.  Were they able to do so, the Court would have had to consider whether the September 24 Policy can satisfy strict scrutiny—that is, whether it is narrowly tailored to achieve a compelling governmental interest.  *See Kane*, 19 F.4th at 169.  The Court does not reach that issue, however, because Plaintiffs fail to meet their initial burden.

       1.   <u>Neutrality</u>

First, the September 24 Policy is neutral on its face.  It applies to anyone who works or learns on the Anschutz Medical Campus or off campus in connection with CU Anschutz programs "who currently or may in the future access any CU Anschutz facility or participate in any CU Anschutz program, or whose employment or academic activities may require in-person interaction with other CU Anschutz employees, students, patients, study subjects, or members of the public, regardless of location."  (ECF No. 15-11 at 1.)  The policy is not intolerant of any religious beliefs, nor does it restrict any practices because of their religious nature.  *See Fulton v. City of Philadelphia*, --- U.S. ----, 141 S. Ct. 1868, 1877 (2021).

Second, the Court finds the September 24 Policy is neutral as applied to Plaintiffs.  "[C]ourts have consistently held that schools that provided a religious exemption from

mandatory vaccination requirements did so *above and beyond* that mandated by that Constitution." *Klaassen*, 2021 WL 3073926, at *39.  Allowing employees, but not students, to request religious accommodations treats employees and students differently, but it does not single out religion or religious practices.  *See Mills*, 16 F.4th at 29.  Plaintiffs have not shown a likelihood of establishing that Defendants implemented the September 24 Policy "with the aim of suppressing religious belief, rather than protecting the health and safety of students, staff, and the community." *Doe*, 19 F.4th at 1177.  Contrary to what Plaintiffs imply, the fact that the University amended its policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions for students are pretextual.

Plaintiffs' reliance on *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), for the proposition that if Defendants provide a religious exemption for employees, it must also do so for students, is misplaced.  In *Tandon*, which addresses exceptions to restrictions on private gatherings for comparable secular and religious activities, the United States Supreme Court held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id.*  But the Court does not see how offering employees the opportunity to request a religious accommodation could amount to treating comparable secular activity more favorably than religious exercise.  For one thing, Plaintiffs have not shown that employees and students are comparable in this context.  "Comparability is concerned with the risks various activities pose." *Tandon*, 141 S. Ct. at 1296.  If students outnumber employees at CU Anschutz, granting religious exemptions for them could significantly undermine the University's goal of protecting the health and safety of patients, faculty, and staff.  *See Doe*,

19 F.4th at 1178 ("[I]f that number [of students who have sought or are likely to seek a medical exemption] is very small and the number of students likely to seek a religious exemption is large, then the medical exemption would not qualify as 'comparable' to the religious exemption in terms of the 'risk' each exemption poses to the government's asserted interests.").  Moreover, although the University has determined it can accommodate some employees by allowing them to work remotely, Plaintiffs have made no showing that a similar accommodation for students is practicable.[2]  And, as Defendants explain in their Response, the September 24 Policy treats employees and students differently because of Title VII of the Civil Rights Act of 1964, which protects the former but not the latter.  *See id.* at 1180 (finding that school district's inclusion of a legally required religious accommodation procedure for employees did not render student vaccine mandate not generally applicable).

Under these circumstances, and on the current record, the Court finds Plaintiffs are not likely to succeed in their attempts to establish that the September 24 Policy is not neutral, either on its face or as applied to Plaintiffs.[3]

### 2.    General Applicability

Nor have Plaintiffs shown they are likely to succeed in establishing that the September 24 Policy is not generally applicable.  "To be generally applicable, a law may not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct."  *Mills*,

---

[2] This is, after all, a medical campus, as opposed to other types of educational settings that might be able to provide learning opportunities remotely that are comparable to in-person learning.

[3] Plaintiffs also assert at various points in their briefing that employees and students are granted religious exemptions more readily on campuses other than on the Anschutz Medical Campus.  (*See, e.g.*, ECF No. 27 at 17-18.)  But these underdeveloped assertions do not provide a basis for finding that the September 24 Policy, which applies solely to the Anschutz Medical Campus, is not neutral or generally applicable as to Plaintiffs, particularly in the context of seeking a preliminary injunction, which requires Plaintiffs to establish a clear and unequivocal right to relief.  *See Schrier*, 427 F.3d at 1258.

16 F.4th at 29.  A law may not be generally applicable if it (1) "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or (2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Fulton*, 141 S. Ct. at 1877 (quotation omitted).  However, "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons."  *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021) (quotation omitted).  And "the mere existence of an exemption procedure, absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable."  *We The Patriots*, 17 F.4th at 288-89.

Plaintiffs argue that the September 24 Policy, which allows medical accommodations for both employees and students, provides a mechanism for individualized exemptions.  But courts considering similar exemptions have rejected this argument.  In *We The Patriots*, the court found the medical exemption at issue did not create a mechanism for individualized exemptions because it provided "an objectively defined category of people to whom the vaccine requirement does not apply."  *Id.* at 289; *see also id.* ("That physicians and nurse practitioners must use their medical judgment to determine whether a particular individual has a contraindication or precaution against receiving the vaccine does not render the exemption discretionary.").  And in *Doe*, the court found that while it may be feasible to manage the Covid-19 risks posed by a small set of objectively defined and largely time-limited medical exemption, allowing a much greater number of permanent religious exemptions could pose a significant barrier to effective disease prevention.  19 F.4th at 1178.  That scenario is consistent with the circumstances of this case,

where Defendants have adduced evidence that they have received more than twice as many requests for religious exemptions as they have for medical exemptions.  (ECF No. 56 at 8.)  The Court agrees with the reasoning in *We The Patriots* and *Doe* and finds that the medical exemption in the September 24 Policy does not render the policy not generally applicable.

Plaintiffs also argue that the September 24 Policy prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, alleging that "medical exemptees are allowed to work and study with minimal restrictions, whether with and around patient, other staff and students, or members of the public.  But those with sincere religious objections are to be fired and expelled, and at least entirely forbidden from in-person contact with anyone affiliated with the Anschutz campus."  (ECF No. 30 at 23, ¶ 65.)  In support of this argument, Plaintiffs cite a single example of a fourth-year medical student who was allowed to participate in medical rounds after receiving a medical exemption.  (*See* ECF No. 3-1 at 3, ¶ 9.)  Defendants apparently concede this allegation for present purposes, asserting this was done in error, that the error has since been corrected, and that at present, "[u]nvaccinated employees and students are not permitted to work in facilities with immunocompromised patients."  (ECF No. 56 at 30.)  Defendants also assert that under the September 24 Policy, the review processes for medical and religious accommodations use the same standard.  (ECF No. 56-17 at 2, ¶ 9.)  Indeed, some Plaintiffs, too, were allowed to continue working past the September 1 vaccination deadline, at least temporarily.  (*See* ECF No. 30 at 26-27, ¶¶ 74, 185.)  The current record leaves the Court with the impression that although the University has made adjustments to its response to the Covid-19 pandemic, it has now settled on enforcing the vaccine mandate pursuant to the September 24 Policy, which is

generally applicable.  Although Plaintiffs may adduce additional evidence that such is not the case, at this stage the Court finds they are not likely to succeed in establishing that the policy is not generally applicable.

**B.    Irreparable Harm**

"When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotation omitted).  Plaintiffs have failed to demonstrate a likelihood of success on their constitutional claims, and the Court finds their asserted harm is not of a constitutional dimension. Plaintiffs' alleged harm based on loss of employment and professional standing or delays and is the type of harm that is typically compensable with money damages. *See We The Patriots*, 17 F.4th at 294.  Accordingly, Plaintiffs' request for a preliminary injunction is denied for the additional reason that they have not shown they will be irreparably harmed if the Court does not enjoin Defendants from enforcing the September 24 Policy.

**C.    Balance of Harms and Public Interest**

The balance of the harms and public interest factors merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Court finds Plaintiffs have failed to demonstrate that the public interest weighs in favor of enjoining enforcement of the September 24 Policy.  Defendants have a compelling interest in ensuring that employees and students associated with Colorado's preeminent medical campus are vaccinated against Covid-19—for their patients' health and safety as well as their own.  It is simply not the case that a medical campus is required to put patients and others in a healthcare environment at risk to accommodate these Plaintiffs.  And during this pandemic, which has placed unprecedented

burdens on healthcare workers, the Court finds the public interest is not served by adding to that burden additional uncertainty about colleagues' vaccination status.

## IV.   CONCLUSION

Therefore, the Court finds Plaintiffs have not shown a clear and unequivocal right to injunctive relief—much less met the high bar for a disfavored injunction—and DENIES the Renewed Motion (ECF No. 27).

DATED this 27th day of January, 2022.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge