**Case Nos. 21-1414 and 22-1027**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

JANE DOES 1-11; JOHN DOES 1, 3-7,
*Plaintiffs - Appellants,*

v.

THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO;
TODD SALIMAN, President of the University of Colorado, in his official capacity;
DONALD ELLIMAN, Chancellor of the University of Colorado Anschutz Campus,
in his personal and official capacities; SHANTA ZIMMER, Senior Associate Dean of Medical Education,
University of Colorado School of Medicine, in her personal and official capacities;
ERIC MEDIAVILLA, Associate Dean for Student Affairs, University of Colorado School of
Dental Medicine, in his personal and official capacities; ANN-MICHAEL HOLLAND, Master of Science
Program Director, Department of Anesthesiology, in her personal and official capacities;
JOHN & JANE DOES 1-9, members of the Vaccine Verify team, in their official & personal capacities,
*Defendants - Appellees.*

*Appeals from the United States District Court for the District of Colorado (Denver),*
*Case No. 1:21-CV-02637-RM-KMT · Honorable Raymond P. Moore, U.S. District Judge*

# APPELLANTS' REPLY BRIEF
## *(Oral Argument is Requested)*

JOSEPH B. BROWN
THERESA L. SIDEBOTHAM
TELIOS LAW
19925 Monument Hill Road
P.O. Box 3488
Monument, Colorado 80132
Telephone: (858) 748-4201
jbb@telioslaw.com
tls@telioslaw.com

PETER C. BREEN
THOMAS MORE SOCIETY
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
Telephone: (312) 782-1680
pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org

MICHAEL G. MCHALE
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
Telephone: (402) 501-8586
mmchale@thomasmoresociety.org

*Attorneys for Plaintiffs and Appellants*

 

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

STANDARD OF REVIEW ...............................................................................5

ARGUMENT ...................................................................................................6

  I.   MOOTNESS. ............................................................................................6

  II.  LIKELIHOOD OF SUCCESS ON THE MERITS. ......................................9

    A.  The September 24 Policy is not neutral. .......................................9

      1.  Lack of Facial Neutrality. ...................................................10

      2.  Lack of De Facto Neutrality. ...............................................14

    B.  The September 24 Policy is Not Generally Applicable. ............19

    C.  Defendants Still Fail Strict Scrutiny. .........................................22

    D.  Rational Basis Scrutiny. .............................................................26

  III.  REMAINING FACTORS. ......................................................................28

    A.  Irreparable Harm. .......................................................................28

    B.  Public Interest and Balance of Harms. .......................................28

CONCLUSION ..............................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Austin v. U.S. Navy Seals 1-26*,
   No. 21A477, 2022 WL 882559 (U.S. Mar. 25, 2022) ........................................24

*Axson-Flynn v. Johnson*,
   356 F.3d 1277 (10th Cir. 2004) ............................................................................8

*Biden v. Missouri*,
   142 S. Ct. 647 (2022)............................................................................................4

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) .............................................................................................5

*Brooklyn Diocese v. Cuomo*,
   141 S. Ct. 63 (2020)............................................................................................28

*Brown v. Buhlman*,
   822 F.3d 1151 (10th Cir. 2016) ..........................................................................22

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) ...........................................................................................23

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin. United States Dep't of Lab.*,
   17 F.4th 604 (5th Cir. 2021) ...............................................................................28

*Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*,
   483 F.3d 1025 (10th Cir. 2007) ..........................................................................27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ...................................................... 6, 9, 14, 19, 21

*Dahl v. Bd. of Trustees of W. Michigan Univ.*,
    15 F.4th 728 (6th Cir. 2021) ......................................................... 12, 25

*Doe v. San Diego Unif. Sch. Dist.*,
    No. 21A217 (U.S. Feb. 18, 2022) ........................................................12

*Doe v. San Diego Unified Sch. Dist.*,
    22 F.4th 1099 (9th Cir. 2022) .............................................................10

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990) .............................................................. 9, 14, 24

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ...................................................... 19, 21, 22, 23

*Garcia by Garcia v. Miera*,
    817 F.2d 650 (10th Cir. 1987) ...........................................................11

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) .........................................................25

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .........................................................29

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ............................................................................6

*Klaassen v. Trs. of Ind. Univ.*,
    549 F. Supp. 3d 836 (N.D. Ind. July 18, 2021) ..................................12

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ............................................................ 2, 18, 19

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..........................................................................24

*New Hope Fam. Servs., Inc. v. Poole*,
 966 F.3d 145 (2d Cir. 2020) ...............................................................17

*Ramos v. Louisiana*,
 140 S. Ct. 1390 (2020) ................................................................. 15, 18

*Rezaq v. Nalley*,
 677 F.3d 1001 (10th Cir. 2012) .........................................................7, 8

*Sherbert v. Verner*,
 374 U.S. 398 (1963) ............................................................................28

*Shrum v. City of Cowetta*,
 449 F.3d 1132 (10th Cir. 2006) ..................................................... 13, 14

*South Bay United Pentecostal Church v. Newsom*,
 141 S. Ct. 716 (2021) ........................................................................3, 11

*Tandon v. Newsom*,
 141 S. Ct. 1294 (2021) ................................................................ 4, 20, 21

*Thomas v. Rev. Bd. of Indiana Sec. Div.*,
 450 U.S. 708 (1981) ............................................................................22

*Thoms v. Maricopa Cnty. Cmty. College Dist.*,
 No. 2:21-cv-01781, 2021 WL 5162538 (D. Ariz. Nov. 5, 2021) ........................12

*U.S. Navy Seals 1-26 v. Biden*,
 27 F.4th 336 (2022) ............................................................................24

*United States v. Iverson*,
 818 F.3d 1015 (10th Cir. 2016) .........................................................20

*Zucht v. King*,
  260 U.S. 174 (1922) ...........................................................................................12


## Other Authorities

Chancellor Elliman Communiques, COVID-19 on Decline (Feb. 18, 2022),
  https://www.cuanschutz.edu/about/leadership/chancellor/communiques/updating
  -campus-protocols-with-covid-19-on-decline .......................................................1

Elie Dolgin, "Omicron thwarts some of the world's most-used COVID vaccines,"
  Nature, Jan. 13, 2022, https://www.nature.com/articles/d41586-022-00079-6;
  CDC, COVID-19, *Omicron Variant: What You Need to Know* ..........................29

CDC, COVID-19, *Omicron Variant: What You Need to Know*
  ("[A]nyone with Omicron infection can spread the virus to others, even if they
  are vaccinated."), https://www.cdc.gov/coronavirus/2019-
  ncov/variants/omicron-variant.html……………......……………………………..29

Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1190, 1225 (March 2022)
  ....................................................................................................................16


## Rules

Fed. R. Evid. 201(b)..................................................................................................20

## PRELIMINARY STATEMENT

The factual and legal errors throughout Defendants-Appellees' Brief (Defs.' Br.) are overshadowed only by their failure to even address many of Plaintiffs-Appellants' arguments—including those showing the ongoing effect of the September 1 Policy, under which all 17 Plaintiffs-Appellants were exiled for not having a "religious belief whose teachings are opposed to all immunizations." (App.Vol.V 1123.) And to be sure, all 17 *remain* terminated or excluded from the University of Colorado Anschutz School of Medicine *because of* their religious beliefs, even though Defendants' alleged interests in maintaining this ongoing discrimination are based on alleged circumstances that no longer exist—i.e., a "stark upward [COVID] turn *in September 2021*" "*when the University's policies went into effect*." (Defs.' Br. 11, 40 (emphasis added).)

But under the First Amendment, bygone alleged interests cannot justify *ongoing* violations of fundamental rights—especially when Defendant Chancellor Elliman has admitted that since February a "continued decline in COVID-19 cases, test positivity and hospitalization rates in the Denver metro area and across our state" justifies the removal of Defendants' previous booster-shot mandate.[1] Put

---

[1] Chancellor Elliman Communiques, COVID-19 on Decline (Feb. 18, 2022), https://www.cuanschutz.edu/about/leadership/chancellor/communiques/updatingcampus-protocols-with-covid-19-on-decline.

simply, Defendants' own arguments (and lack thereof) belie any reason in law or fact for their continued trampling on Plaintiffs' First Amendment rights.

Most glaringly, Defendants completely ignore Plaintiffs' arguments that the September 24 Policy's "historical background" and "specific series of [preceding] events" easily raise the strict-scrutiny triggering "slight suspicion" that "distrust of [Plaintiffs' religious] practices" animates their categorical exclusion under the September 24 Policy. Indeed, that Policy is a transparently litigation-motivated substitute for the September 1 Policy's explicit religious discrimination. *See Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018); *see also* Elliman Sec. Decl., No. 22-1027, Doc. No. 010110654461, Ex. BB at ¶11 (averring that September 24 Policy removed "certain language governing religious exemptions" from the September 1 Policy because it "rendered the policy vulnerable to challenge"). (Op. Br. 41-46.)

Defendants simply argue that this issue was a judgment call for the district court. (Defs.' Br. 30-31.) But that's merely an attempt to cloak a legal conclusion about the September 24's alleged "neutrality" into a purported "fact-finding" that, if credited, would distort appellate review of non-religiously neutral government actions both in this and future cases for years to come.

Additionally, the September 24 Policy's allegedly independent evaluators (Defs.' Br. 17) do not eliminate the discriminatory taint reflected in the Policy's

*formal standard* (categorically forbidding student religious exemptions, and effectively prohibiting all in-person exceptions), especially when so many other medical facilities (in Colorado and beyond) are readily offering exemptions for both medical and religious reasons, *including to some of these very Plaintiffs themselves*. (Op. Br. 50-51.) Moreover, the idea that the September 24 Policy's categorical ban on student religious exemptions was simply a response to "rising numbers of infections" (Defs.' Br. 21) is self-evidently false, since it is undisputed that Defendants granted *zero* religious exemptions under the September 1 Policy. (Op. Br. 43 n.17.)

Defendants also wrongly argue that Plaintiffs' non-neutrality argument relies on a Justice Gorsuch "dissent" in *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021). (Defs.' Br. 30.) But Justice Gorsuch's opinion was a "Statement" in partial support of the Supreme Court's order granting injunctive relief to churches from California's then-ongoing church-closure rule. *Id.* Crucially, Justice Gorsuch's "Statement" was joined *in full* by Justices Alito and Thomas, *see id.*, and "agree[d] with" by Justices Barrett and Kavanaugh in *everything but* its "contention" that the Court should enjoin California's then-ban on singing and chanting in churches. *Id.* at 717 (Barrett, J., concurring). Thus, *a majority of the Supreme Court* agreed with the portion of Justice Gorsuch's "Statement" that California engaged in obvious "targeting of religion" when it

"openly imposed more stringent regulations on religious institutions" by "assign[ing] places of worship their own" category. *Id.* at 717 (Statement of Gorsuch, J.); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296-97 (2021) (relying on same "statement of Justice Gorsuch" three times in describing Free Exercise legal standard).[2]

Defendants also falsely accuse "Plaintiffs [of] argu[ing] facts and evidence that were not before the District Court," i.e., the wide availability of religious exemptions at UC Health and at the Colorado Mental Health Institute. (Defs.' Br. 3, 37-38.) But Plaintiffs' Verified Amended and Supplemental Complaint specifically notes that Jane Doe 11 received a religious exemption from the Mental Health Institute (App.Vol.V 1022, 1063), and that "the University of Colorado's own health care system" was also providing religious exemptions. (*Id.* 1084-85, 1216-17.) And in Plaintiffs' Reply in Support of their Renewed Motion for Preliminary Injunction, they informed the district court that public reporting revealed UC Health alone had granted *more than 1,100 medical and religious exemptions* by November 2021. (App.Vol.VI 1396, 1414.) Plaintiffs' sworn testimony also explained that the Institute had granted an additional religious

---

[2] Defendants also wrongly say their Policy "is consistent with" the federal COVID-19 vaccine mandate for healthcare workers, which they say "has been upheld by the Supreme Court." (Defs.' Br. 16 n.6.) But the Supreme Court recognized that "[t]he rule requires providers to offer medical and religious exemptions," with no categorical bar on in-person exemptions. *Biden v. Missouri*, 142 S. Ct. 647, 651 (2022).

exemption to Jane Doe 11's husband, and that the VA Center had granted a religious exemption to Jane Doe 3. (Id. at 1414, 1425, 1441.)

Further, Defendants claim that natural immunity is "non-durable" (Defs.' Br. 13), without acknowledging that one of their own experts publicly concedes that COVID vaccination is non-durable, too. (App.Vol.VI 1448.)

Finally, as discussed more below, Defendants misapprehend this Court's own precedent on religious neutrality; ignore key comparators in attempting to establish general applicability; fail to explain why they can't follow numerous other medical facilities that allow in-person exceptions; and deflect from their Policy's obvious irrationality—especially in its application to Plaintiffs who work entirely off campus at facilities that wanted to keep them.

The same essential errors infected the district court's analyses below. Accordingly, this Court should reverse.

## STANDARD OF REVIEW

Defendants argue this Court is not "obligated to independently review the factual record" here, because they say that standard applies only in First Amendment cases where "the ultimate conclusions of law are virtually inseparable from findings of fact." (Defs.' Br. 8 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-49 (2000).) But Defendants ignore *Boy Scout*'s citation to the more complete standard in *Hurley*, which further explained that "the reaches of the First

Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995); *see also id.* (in "speech case[s] . . . we are obliged to make a fresh examination of crucial facts"); *accord Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 540-42 (1993) ("survey[ing] meticulously" the factual record in free exercise analysis). Therefore, this Court is obliged to independently review the facts.

## ARGUMENT

## I.    MOOTNESS.

Defendants argue that Plaintiffs' appeal in Case No. 21-1414 is procedurally moot, regurgitating arguments from their motion to the same effect already pending with this Court. They also argue that Plaintiffs' challenge to the September 1 Policy is substantively moot—yet they completely ignore this Court's key precedent confirming otherwise.

As to the procedural issue, the parties have already fully briefed Defendants' pending Motion to Dismiss Plaintiffs' appeal in No. 21-1414. *See* Dkt. No. 10896802. Defendants now attempt to supplement that briefing here, (Defs.' Br. 4-6), continuing to ignore that Plaintiffs filed an "Amended *& Supplemental*" Complaint (App.Vol.V 1019) (emphasis added), which did not "necessarily

extinguish[] the controversy stemming from their prior request for injunctive relief." (Defs.' Br. 4.) As Plaintiffs have explained (Dkt. No. 10896719), Defendants' position would curtail this Court's ability to review the district court's first Order denying Plaintiffs Jane Doe 1 and John Doe 1's original Motion for Preliminary Injunction, which Order erroneously required *Plaintiffs to show non-mootness*. (Op. Br. 33.) It thus found Plaintiffs' challenge to the September 1 Policy moot—even before they (or the other Plaintiffs) were purportedly re-evaluated under the September 24 Policy. (App.Vol.III 625-26.) Thus, Plaintiffs' appeal in No. 21-1414 is not moot.

Next, Defendants argue that any challenge to the September 1 Policy is moot *simply because* "that policy had already been rescinded and replaced by the time Plaintiffs filed their complaint and motion for preliminary injunction," and because there is no evidence suggesting it might be reinstated. (Defs.' Br. 23-24.) But Defendants completely ignore this Court's past holding that mootness arguments cannot place "undue focus on the policies themselves" where, as here, Plaintiffs claim the new policy did not remedy the unconstitutional effects of the former one. *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012). Thus, the prospect of reinstatement (i.e., the rule of voluntary cessation) is *not at issue here* since Plaintiffs argue the September 24 Policy did *not* "completely and irrevocably eradicate the effects of the" September 1 Policy, against which "some prospective

7

relief" thus "remains available." *Id.* Tellingly, Defendants do not even attempt to distinguish *Rezaq*, effectively conceding Plaintiffs' argument.

As to Jane Does 2 and 9, Defendants argue they already determined that Jane Doe 2 would be an "undue hardship" and thus that "there is no reason to believe" they would find otherwise under the September 24 Policy, since "her core duties include minor patient care." (Defs.' Br. 25.)  But Defendants denied Jane Doe 2's request for exemption on September 16, 2021—the day after they received a demand letter from Jane Doe 1 thoroughly explaining the unconstitutionality of the September 1 Policy—rendering their "undue hardship" claim suspect, at best. (App.Vol.V 1046.) Moreover, Defendants now admit they recently found a way to retain Jane Doe 5 after previously telling her she could not work entirely remotely (Defs.' Br. 19 n.8), so there is no reason to think Jane Doe 2 would necessarily be denied if finally re-evaluated under the September 24 Policy. As to Jane Doe 9, Defendants say she was fired for failing to observe protocols for the unvaccinated on campus (Defs.' Br. 25), but Defendants ignore the fact that she also received the August 26 email from Vaccine Verify denying her religious exemption *simply for belonging to the "wrong" religion*. (App.Vol.V 1059.) Thus, Defendants' "other-reasons" excuses here are quintessentially pretextual under this Court's precedent. *See, e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004). (Op. Br. 43.)

Thus, none of Plaintiffs' claims is moot.

## II.    LIKELIHOOD OF SUCCESS ON THE MERITS.

While a "neutral law of general applicability" that burdens religion must satisfy only rational basis scrutiny, *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990), "[a] law burdening religious practice that is not neutral or not of general applicability must undergo the most rigorous scrutiny," *Lukumi*, 508 U.S. at 546. Defendants' arguments only confirm that they must satisfy that "most rigorous" scrutiny here.

### A.    The September 24 Policy is not neutral.

Defendants argue that their allegedly benign goal of protecting the Anschutz community from COVID-19 shields the September 24 Policy from all concerns of religious neutrality. Not so.

As Plaintiffs have noted, controlling precedent makes clear that benign ends cannot justify intentionally discriminatory means. (Op. Br. 40-41.) Thus, as to the student Plaintiffs, while Defendants say their express exclusion of student religious exemptions simply abides by "federal law" (i.e., Title VII), they ignore the fact that *higher* federal law (the First Amendment) prohibits expressly disfavoring the religious practices of any portion of the Anschutz community, including students. As to both the student and employee Plaintiffs, the September 24 Policy's background as a litigation-motivated re-write of an explicitly discriminatory Policy

9

easily raises the specter of ongoing religious discrimination. This is only confirmed by the fact that several Plaintiffs were *granted religious exemptions by their off-campus physical places of work*, but are somehow still excluded under Defendants' allegedly "neutral" standard. Defendants do not even attempt to justify these arbitrary results or explain away the discriminatory taint they reflect.

## 1. Lack of Facial Neutrality.

Defendants argue that the September 24 Policy's explicit ban on student religious exemptions does not undermine facial neutrality because the distinction is allegedly between students and employees, not religion and non-religion. (Defs.' Br. 27-30.) As evidence, they note that only employees are entitled to apply for religious accommodations under Title VII of the Civil Rights Act of 1964. (*Id.*) But Defendants continue to ignore the First Amendment significance of *expressly* (and thus *directly*) singling out students' religiously motivated objections to COVID vaccines for disfavored treatment. Thus, the seven Ninth Circuit judges got it right in finding a similar religious exemption scheme in San Diego Unified Schools' COVID-19 vaccine mandate (authorizing religious exemptions for staff while explicitly forbidding them for students) "*expressly* targets the religious for worse treatment in direct violation of Supreme Court precedent." *Doe v. San Diego Unified Sch. Dist.*, 22 F.4th 1099, 1103 (9th Cir. 2022) (Bumatay, J., dissenting from denial of rehearing en banc) (emphasis in original).

Defendants highlight that this seven-Judge analysis was a *dissent* from a decision holding to the contrary (as Plaintiffs have acknowledged) (Op. Br. 39), but Plaintiffs rely on it here for its *persuasive value*, notwithstanding the contrary decision. *See Garcia by Garcia v. Miera*, 817 F.2d 650, 658 (10th Cir. 1987) ("[T]he decisions of one circuit court of appeals are not binding upon another circuit.").

Further, the Ninth Circuit's seven-Judge dissent properly relied on the Supreme Court's majority view, noted above, that California's COVID rules "obviously target[ed] religion for differential treatment" by "openly impos[ing] more stringent regulations on religious institutions than on many businesses" by "assign[ing] places of worship their own [category]." *South Bay*, 141 S. Ct. at 717 (Statement of Gorsuch, J.), *as cited by Doe*, 22 F. 4th at 1103 (Bumatay, J., dissenting). That's because government may not "single[] out religion for worse treatment." *South Bay*, 141 S. Ct. at 719 (Statement of Gorsuch, J.) (*See* Op. Br. 38.) But that's *exactly* what Defendants have done here by explicitly barring students from seeking "religious accommodations." (App.Vol.V 1256.)

Defendants argue there is a de facto exception to the rule against religious targeting for student vaccine mandates in schools, based on the notion that "the Constitution simply does not require schools to provide students religious exemptions from mandatory vaccination." (Defs.' Br. 29-30 (citing *Doe*, 19 F.4th

11

at 1180, and *Klaassen v. Trs. of Ind. Univ.*, 549 F. Supp. 3d 836, 890 (N.D. Ind. July 18, 2021).) But the Supreme Court has never held that public schools or universities may implement vaccine mandates *in any manner whatsoever* without regard to the Constitution. Indeed, it has held the exact opposite. *See Zucht v. King*, 260 U.S. 174, 176-77 (1922) (rejecting facial constitutional challenge to San Antonio school district's student vaccine mandate, but finding a "substantial constitutional question" as to whether the school district's *application* of the mandate violated the Equal Protection Clause). In like manner, the Sixth Circuit Court of Appeals recently held that a public university's non-neutral and non-generally applicable COVID-19 vaccine mandate for student-athletes likely violated the Free Exercise Clause). *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 735 (6th Cir. 2021); *see also Thoms v. Maricopa Cnty. Cmty. College Dist.*, No. 2:21-cv-01781, 2021 WL 5162538, at *10 (D. Ariz. Nov. 5, 2021) (public medical school's allowance of medical but not religious exemptions from school's COVID-19 vaccine mandate likely violated First Amendment).

Moreover, while the Supreme Court recently denied emergency injunctive relief in *Doe v. San Diego*, it did so based on procedural grounds "*without prejudice to applicants seeking a new injunction if circumstances warrant*." *Doe v. San Diego Unif. Sch. Dist.*, No. 21A217 (U.S. Feb. 18, 2022) (emphasis added). In short, the Supreme Court *invited* a renewed First Amendment challenge to the

school district's vaccine mandate should it later be reinstated in similar form. Indeed, the plaintiffs recently accepted that invitation. *See Doe v. San Diego Unified Sch. Dist.*, 3:21-cv-1809, ECF No. 34 (S.D. Cal. Apr. 29, 2022) (Plaintiffs' Verified First Amended Complaint in response to school district's renewal of similar vaccine mandate).

Finally, Defendants entirely misapprehend this Court's decision in *Shrum v. City of Cowetta*, 449 F.3d 1132 (10th Cir. 2006), which prohibits using religious discrimination as a means to achieving a secular end. Defendants say their actions are distinguishable because of an alleged lack of evidence that "the University was motivated by religious discrimination *when it enacted the September 24 Policy*." (Defs.' Br. 31 (emphasis added).) But as Plaintiffs have explained (Op. Br. 40-41), *Shrum* confirms that "the Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise . . . for secular reasons." *Shrum*, 449 F.3d at 1145. Thus in *Shrum*, this Court recognized actionable religious discrimination if the plaintiff police officer could show that his police chief intentionally interfered with his religious exercise *in order to* force him out of the police force *because of his allegedly poor work performance*. *Id.* at 1143-45.

Defendants violate the same principle here, since their categorical ban on student religious exemptions *explicitly* (and thus intentionally, not indirectly)

"interfere[s] with [Plaintiffs'] religious exercise," *Shrum*, 449 F.3d at 1145, *in order to* "further[] the University's goal of requiring as many students as possible to get vaccinated." (Defs.' Br. 21.) *See Smith*, 494 U.S. at 895, 894-97 (O'Connor, J., concurring) (noting the *Smith* majority eliminated strict scrutiny only for "indirect" burdens on religion, while retaining it for "direct" burdens).

Thus, the September 24 Policy easily fails the test of facial neutrality.

### 2.    Lack of De Facto Neutrality.

Defendants give short-shrift to Plaintiffs' additional argument that the September 24 Policy also lacks religious neutrality *in effect*, given its nexus with the explicitly discriminatory September 1 Policy. (Op. Br. 41-46.)

In a single paragraph, Defendants ask this Court to simply defer to the district court's "review[] [of] the policy's history," along with its conclusory determination that "the fact the University amended its policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions for students are pretextual." (Defs.' Br. 30-31 (quoting Dist. Ct. Or. at App.Vol.VII 1670).) But that would ignore this Court's duty to "survey meticulously" the actual evidence of ongoing discrimination here. *See Lukumi*, 508 U.S. at 534.

As noted, Defendants say the September 24 "policy change was made in response to the rising numbers of infections" in Colorado at that time. (Defs.' Br.

at 21.) But that is manifestly false, since Defendants do not deny that they granted *zero* religious exemptions under the September 1 Policy. (Op. Br. 43 n.17.) By this logic, there was no reason to purportedly *further clamp down* on religious exemptions in the September 24 Policy (under which they say they have *actually granted* some religious "accommodations"). (Defs.' Br. 2.)

Instead, "seeking to avoid unwanted" judicial scrutiny, "and aware that this Court would strike down any policy of overt discrimination against [religion] as a violation of the Fourteenth Amendment," Defendants attempted to "sculpt[] a 'facially [religion]-neutral' rule permitting" religious exemptions only for employees, and only if they would not pose "undue hardships" (i.e., if they could work entirely remotely). *Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020) (striking down Louisiana and Oregon non-unanimous jury rules based on their racially discriminatory background); *accord* Elliman Sec. Decl., No. 22-1027, Doc. No. 010110654461, Ex. BB at ¶11; *see also* Declaration of Carolyn  Brownawell, Vice Chancellor and Chief Human Resource Officer at Anschutz, at ¶4, stating that the September 24 Policy revised the September 1 Policy "in two ways": (a) by prohibiting religious exemptions for students, and (b) by "mak[ing] clear" that employee religious exemption requests "will not depend on whether the request is based on 'religious belief whose teachings are opposed to all immunizations,' but

only whether the employee has demonstrated a sincerely held religious belief").

(App.Vol.VI at 1328.)

Relatedly, Defendants do not deny that this change had the *same practical results* as the September 1 Policy, under which the seven now-"accommodated" Plaintiffs were also allowed to continue working remotely or in isolation *effectively indefinitely*, (Op. Br. 4 n.3, 12-13, 19, 20), while the remaining Plaintiffs were (and still remain) forever barred from the Anschutz community. Defendants plainly reverted to the September 24 Policy in response to the threat of litigation (Op. Br. 1, 11; App.Vol.V 1046)—as Defendant Elliman has openly admitted to this Court. *See* Elliman Sec. Decl., ¶11. But Defendants do not even dispute that where, as here, "the jeopardized policy is amended or 'replaced' with a policy that functions similarly, the intervening event of threatened litigation is a key piece of information binding the policies together." Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1190, 1226 (March 2022); *accord Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted . . . by an employer who 'fully' articulates its reasons for the first time months after the decision was made."). (Op. Br. 45.)

Defendants further admit that the Anschutz vaccine mandate was intended to follow the allegedly similar mandate by the Colorado Board of Health. (Defs.' Br. 14.) (Op. Br. 23-24.) Yet Defendants offer no rebuttal to fact that where, as here,

"a regulation purports to implement a statute" (here, the Board mandate) "whose text and history signal an intent for some accommodation of religious beliefs" (like the Board mandate's express allowance of religious exemptions) (Op. Br. 44), there is manifest religious hostility "if agency actions" (here, Defendants' Policies) "afford[] no such accommodation." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 166 (2d Cir. 2020). Moreover, Defendants do not deny that their supposed "accommodations" of fully remote or isolated workers' religious objections are not the equivalent of *in-person exemptions* authorized by the Board, given that Defendants' "accommodations" *merely remove persons from the scope of the rule*. (Op. Br. 4 n.3, 5.)

At most, Defendants simply imply that the September 24 Policy's allegedly new process carried out by allegedly independent actors eliminates all vestiges of the September 1 Policy. (Defs.' Br. 17.) But that process *requires* finding that any in-person work or study while unvaccinated would be an "undue hardship" (Defs.' Br. 16)—even though the satellite facilities where Jane Does 1 and 11 exclusively worked (i.e., more than 60 and 100 miles away from the Anschutz campus, respectively) did not consider them to be undue hardships at all. (Op. Br. 15-17; see also Op. Br. at 50-51 (noting Jane Doe 3 received a religious exemption from the VA Center in her capacity as a staff member there, while being denied by Defendants to work at the same location in her capacity as an Anschutz faculty

17

member).) *See Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted . . . by an employer who 'fully' articulates its reasons for the first time months after the decision was made.")

Plainly, the September 24 Policy's carefully "sculpted" *standard*, as illuminated by its arbitrary results, contains the discriminatory taint of the September 1 Policy. *See Ramos*, 140 S. Ct. at 1394. And tellingly, Defendants do not deny that even under the September 24 Policy, they *still* lectured Jane Doe 1 that she remained disqualified because "as a bioethicist, [she] was surely aware" that drugs like Tylenol and Aspirin (which she herself prescribes) allegedly "have been tested on the same" aborted-fetal cell lines as available COVID vaccines (even though *she knew* that drugs like Tylenol and Aspirin lack the same *developmental* connection to aborted stem cells). (Op. Br. 2-3, 45.) *See Masterpiece Cakeshop*, 138 S. Ct. at 1731 (government "cannot act in a manner that presuppose[s] the illegitimacy of religious beliefs").

Finally, Defendants do not dispute that they eliminated on-site medical exceptions last December "because of" Plaintiffs' religious beliefs—i.e., to "level-down" the playing field in an attempt to undercut Plaintiffs' general-applicability claim (see *infra*). (Op. Br. 46.)

Accordingly, Defendants have not come close to eliminating the "even slight suspicion" that the September 24 Policy's prohibition of Plaintiffs' requested

exemptions continues to "stem from animosity to religion *or distrust of its practices*" (i.e., of Plaintiffs' religious objections to COVID vaccination). *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 547). For this reason alone, Plaintiffs' ongoing exclusion from the Anschutz community must satisfy strict scrutiny.

### B.    The September 24 Policy is Not Generally Applicable.

In attempting to argue the September 24 Policy is generally applicable, Defendants entirely ignore key comparators based on false assumptions that Plaintiffs have not properly raised them to this Court. They also fail to show that their litigation-motivated elimination of in-person medical exemptions is likely to be permanent, or that medical exceptions (and other secular exceptions) do not undermine their interests in stopping COVID and its effects in a similar way as Plaintiffs' would-be exemptions.

As Defendants acknowledge, a law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1887 (2021). But Defendants fail to even account for all of the "comparable secular activity" that they "treat . . . more favorably than [Plaintiffs'] religious exercise." *Tandon*, 141 S. Ct. at 1296.

Defendants say that Plaintiffs failed to argue in the district court that unvaccinated patients and un-boosted Anschutz individuals—who remain included in the Anschutz community—are relevant comparators. (Defs.' Br. 32 n.11.) This is wrong-headed on two fronts. First, Plaintiffs explicitly argued to the district court that "Defendants have no rule prohibiting unvaccinated *patients* from being treated by members of the Anschutz community." (App.Vol.VI 1413 (emphasis in original).) Second, Defendants eliminated their booster mandate *after* the district court's order denying Plaintiffs' second motion for preliminary injunction.[3] And this Court can take judicial notice of "facts 'not subject to reasonable dispute' . . . upon motion or *sua sponte* and at any stage of the proceedings, even on appeal." *United States v. Iverson*, 818 F.3d 1015, 1028-29 (10th Cir. 2016) (O'Brien, J., concurring) (quoting Fed. R. Evid. 201(b)). Here, it is not subject to reasonable dispute that Defendants have now lifted their booster mandate. And Defendants do not dispute the fact that primary COVID vaccination (without booster shots) has a transmissibility effectiveness rate against the Omicron variant of *0% to 20%*, at best—which Plaintiffs also presented to the district court. (App.Vol.VI 1447.)[4]

---

[3] Elliman, *supra* n.1.

[4] Defendants also falsely say Plaintiffs did not inform the district court of "the current percentage of vaccinated employees and students" (Defs.' 32 n.11), but Plaintiffs did exactly that in explaining that the 37,000-member Anschutz community had a vaccination rate above 99% by January 4, 2022. (App.Vol.VI 1427.)

Thus, unvaccinated patients and the innumerable amount of un-boosted individuals who remain included at Anschutz and its affiliate clinics render the September 24 Policy substantially underinclusive, and thereby non-generally applicable. *See Lukumi*, 508 U.S. at 543. That's because their activity plainly "undermines the government's interests," *Fulton*, 141 S. Ct. at 1877, in "limit[ing] the transmission of the virus" and "reduc[ing] staffing shortages" (Defs.' Br. 16.) Defendants pose no argument to the contrary, notwithstanding their ongoing exclusion of these Plaintiffs.

Defendants also *entirely ignore* the comparability of, and de facto exemption for, Anschutz staff and students who remain allowed to work at affiliate sites that grant both religious and medical exemptions to their own staff members. (Op. Br. 50.) Thus, to the extent these Anschutz members (many of whom also work on campus) are allowed to work alongside innumerable unvaccinated individuals at affiliate sites, Defendants are allowing "comparable" "activities" (i.e., the vaccinated to work alongside the unvaccinated) without providing requisite equal treatment for Plaintiffs. *See Tandon*, 141 S. Ct. at 1296.

As to medical exceptions, Defendants continue to argue their months-long allowance of in-person medical exceptions in the fall of 2021 was a "hiccup[]." (Defs.' Br. 34). But critically, they do not dispute that those who are unvaccinated for medical reasons pose the same risks to their interests as those who are

21

unvaccinated for religious reasons. (Defs.' Br. 32-35.) Yet Defendants do not even attempt to show that it "is absolutely clear" that their allowance of in-person medical exceptions "could not reasonably be expected to recur," as is their burden when engaging in kind of mid-litigation "gamesmanship" they did by eliminating medical exceptions (now conveniently labeled as "hiccups") after months of allowing them last fall. *See Brown v. Buhlman*, 822 F.3d 1151, 1166 (10th Cir. 2016). (Op. Br. 48-49.) Thus, especially in light of the recent (and potentially recurring) crisis in healthcare staffing in Colorado,[5] Defendants' own practice of allowing in-person medical exceptions remains a valid comparator to Plaintiffs' currently excluded activity.

Accordingly, the September 24 Policy is not generally applicable, and it must undergo strict scrutiny for this separate reason alone.

### C.    Defendants Still Fail Strict Scrutiny.

In attempting to satisfy strict scrutiny, Defendants fail to show they have an ongoing compelling interest in denying "specific exemptions to [these] particular religious claimants." *Fulton*, 141 S. Ct. at 1881. They also fail to show that denying these exemptions is the "least restrictive means" of achieving their alleged interests. *Thomas v. Rev. Bd. of Indiana Sec. Div.*, 450 U.S. 708, 718 (1981).

---

[5] State of Colorado, Department of Public Health & Environment, "State activates crisis standards of care for staffing of health care systems," November 9, 2021, https://covid19.colorado.gov/press-release/state-activates-crisis-standards-of-care-for-staffing-of-health-care-systems.

Defendants assert a compelling interest at a sky-high level of generality—i.e., "protecting the health and safety of" the Anschutz community. (Defs.' Br. 39.) But that's exactly the kind of "broadly formulated interest" the Supreme Court recently held cannot justify a substantial burden on religious exercise. *Fulton*, 141 S. Ct. at 1881. Indeed, Defendants make no effort to show why they have a compelling interest in *denying religious exemptions to these specific Plaintiffs*, particularly when the record shows a more-than 99% vaccination rate at Anschutz. (App.Vol.VI 1427.) Defendants refuse to acknowledge that one of their own experts swears that PPE "has been quite effective in preventing the spread" of COVID at Anschutz, (App.Vol.VI 1345, ¶7), and that another of their experts publicly concedes the ineffectiveness of not being fully boosted, (App.Vol.VI 1448.) Thus, Defendants' ongoing burden on Plaintiffs' religion does not produce the more than "marginal" gains necessary to establish a cognizable compelling interest. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799, 803 n.9 (2011).

Even Defendants' broadly formulated interests are based on circumstances "[i]n September 2021," and when "the situation continued to deteriorate" in "October [] 2021," and on "CDC advice" "prior to implementing the September 24 Policy" (communicating the since-busted myth that the "unvaccinated" are "much more likely to get infected, and therefore transmit the virus"). (Defs.' Br. 41.) (*See, e.g.*, App.Vol.VI 1447-48, ¶20 (noting that by the end of 2021, a study of residents

in Ontario, Canada showed a higher COVID case rate in vaccinated residents than in unvaccinated residents).) But a non-neutral or non-generally applicable rule that is burdening religious exercise *right now* must also further a compelling interest *right now*. *See Smith*, 494 U.S. at 888. Thus, even assuming Defendants' interests were not overly broad (though they are), they are outdated by their own terms.[6]

Defendants' narrow-tailoring arguments fare no better. In fact, they summarily allege narrow tailoring "because employees and students have a greater risk of contracting and spreading COVID-19 if they interact with unvaccinated patients, coworkers, and classmates" (Defs.' Br. 41-42)—without acknowledging that they *already allow* their employees and students to "interact with unvaccinated patients" on the Anschutz campus, and with "unvaccinated coworkers [and] classmates" at affiliate sites.

As to their obligation to consider the practices of other "jurisdictions" (here, medical facilities in the Denver metro area and beyond), *see McCullen v. Coakley*, 573 U.S. 464, 494 (2014), Defendants merely criticize Plaintiffs' data showing that

---

[6] Defendants say the Fifth Circuit's recent decision in *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (2022) "does not support Plaintiffs' argument" because the Supreme Court recently granted a "partial stay" of the preliminary injunction in that case. *See Austin v. U.S. Navy Seals 1-26*, No. 21A477, 2022 WL 882559 (U.S. Mar. 25, 2022). But as Plaintiffs anticipated (Op. Br. 54 n.25), the Supreme Court did *not* hold that the Navy has a compelling interest in *denying religious exemptions altogether*, but merely authorized *taking vaccination status into "consider[ation]"* in making "deployment, assignment, and operational decisions" for the highly specialized Navy Special Warfare plaintiffs in that case. (Emphasis added.)

the University of Nebraska Medical Center in Omaha, Nebraska, has granted

nearly 200 religious exemptions from its COVID vaccine mandate. (App.Vol.IV

989); (Defs.' Br. 37 n.13.) Defendants say this information has "issues of

authenticity, foundation, and relevance" (despite having derived from a public

records request by attesting Plaintiffs' counsel)—ignoring that "the Federal Rules

of Evidence do not apply to preliminary injunction" proceedings. *Heideman v. S.

Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). They also incorrectly claim

that "what another state's university could or could not accommodate based on

differing populations, geography, health risks, etc., is *irrelevant*" (id.) (emphasis

added), contrary to *McCullen*, and even though the Sixth Circuit recently found a

lack of narrow tailoring in Western Michigan University's student-athlete vaccine

mandate given that "several other universities grant exemptions from their

COVID-19 mandates." *Dahl*, 15 F.4th at 735.

Defendants also say the September 24 Policy's categorical ban on all in-

person exemptions is "carefully and narrowly tailored . . . to the circumstances it

confronted *in Colorado*," which were allegedly much more severe than in

Nebraska. (Defs.' Br. 37 n.13 (emphasis in original).) But this amounts to a self-

defeating "own goal," as it were, since the record reflects that the vast UC Health

system "*in Colorado*" granted approximately *1,100 religious and medical

exemptions* by November 2021, without any signs of harm to a common interest in

25

stopping COVID. (App.Vol.VI 1396, 1414.) That's not to mention the exemptions granted by Colorado medical facilities to Jane Does 11, 3, and effectively 1, (*see* App.Vol.III 617-618), discussed herein.

Thus, the September 24 Policy easily fails strict scrutiny.

### D.    Rational Basis Scrutiny.

Defendants argue that Plaintiffs formulate a rational basis challenge for the first time on appeal (*see also* Op. Br. 57 n.26), even as they admit that "the District Court considered similar assertions from Plaintiffs" already. (Defs.' Br. 37.) Indeed, the district court considered the same facts underlying Plaintiffs' claim of irrationality, and it still had "no trouble" holding that Defendants satisfied rational basis scrutiny. Ultimately, however, Defendants attempt to justify that decision through mere smoke and mirrors.

Defendants completely ignore the irrationality of excluding Jane Doe 1 from Children's Hospital in Colorado Springs, more than 60 miles away from the Anschutz Campus (even though her supervisor said this would put "critically ill children" at "risk") (Op. Br. 16); and of excluding Jane Doe 11 from the Colorado Mental Health Institute in Pueblo, more than 100 miles away from the Anschutz Campus (even though the Colorado Department of Human Services granted her a religious exemption to continue working there). (Op. 17.) (Defs.' Br. 35-39.)

Defendants merely allege that some of these facts are newly raised on appeal (Defs.' Br. 37-38), which is manifestly false (see *supra*).

Defendants also re-argue that the Policy is rational *because* it is neutral and generally applicable. (Defs.' Br. 37-38.) But a policy's (alleged) neutrality and general applicability merely triggers rational basis scrutiny, without resolving it. Defendants also point to the district court's finding that that September 24 Policy "applies solely to the Anschutz Campus," (Defs.' Br. 37) but that finding is clearly erroneous given that the Policy clearly applies to many off-campus sites (and to Plaintiffs who work entirely off-campus), as well.

Defendants also rely on a string of cases finding that COVID-19 vaccine mandates satisfy rational basis scrutiny. (Defs.' Br. 36 n.12.) But Defendants fail to show that any of them include mandates that arbitrarily apply more than 60 and 100 miles from their respective spheres of interest, as does the September 24 Policy. Defendants further say this Court should blindly defer to their "reasonable medical judgments" (Defs. Br. 38 n.14), but that ignores this Court's duty to ensure that "[t]he State not rely on a classification" (here, denying religious exemptions to individuals who must work in-person, even at satellite facilities more than 100 miles away) "whose relationship to an asserted goal" (here, protecting the Anschutz campus community) "is so attenuated as to render the distinction arbitrary or irrational." *Christian Heritage Acad. v. Oklahoma Secondary Sch.*

*Activities Ass'n*, 483 F.3d 1025, 1033 (10th Cir. 2007); *see also Brooklyn Diocese*

*v. Cuomo*, 141 S. Ct. 63 (2020) (applying normal constitutional analysis to public

health officials' COVID policy judgments).

Thus, the September 24 Policy also still fails rational basis scrutiny.

## III.    REMAINING FACTORS.

### A.    Irreparable Harm.

Defendants essentially concede that Plaintiffs are suffering irreparable harm

if they are likely to prevail on the merits (which they are). (Defs.' Br. 42.) But they

also wrongly argue that Plaintiffs have merely suffered compensable employment-

type injuries here. (*Id.* 42-43.) However, when *government* "forces [someone] to

choose between following the precepts of her religion and forfeiting benefits," it

imposes a "burden on the free exercise of religion," *Sherbert v. Verner*, 374 U.S.

398, 404 (1963), which is a quintessential "irreparable harm," *BST Holdings,*

*L.L.C. v. Occupational Safety & Health Admin. United States Dep't of Lab.*, 17

F.4th 604, 618 n.21 (5th Cir. 2021). Defendants have done exactly that here.

### B.    Public Interest and Balance of Harms.

Defendants assert broadly formulated interests in ameliorating COVID-19's

worldwide "catastrophic impact" by denying an injunction to these 17 Plaintiffs

(Defs.' Br. 44)—even while the Anschutz community remains more than 99%

vaccinated, affiliate medical clinics readily grant exemptions (including to some of

these Plaintiffs), vaccine effectiveness plummets,[7] un-boosted individuals roam about campus, and "critically ill children" and patients likely suffer as a result of their former caregivers' exclusion from the Anschutz community and beyond. (*See supra.*) Obviously Defendants' assertions are vastly "overstated." (Defs.' Br. 43.)

Moreover, Defendants do not dispute that "it is always in the public interest to prevent a violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1115 (10th Cir. 2013). Accordingly, the public interest and balance of harms plainly favor a preliminary injunction here.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the district court's judgments below and grant Plaintiffs'-Appellants' renewed motion for preliminary injunction.

Respectfully submitted,

*/s/ Peter Breen*
Peter Breen
**THOMAS MORE SOCIETY**
309 W. Washington, Ste. 1250
Chicago, IL 60606
312-782-1680

---

[7] *See, e.g.*, Elie Dolgin, "Omicron thwarts some of the world's most-used COVID vaccines," Nature, Jan. 13, 2022, https://www.nature.com/articles/d41586-022-00079-6; CDC, COVID-19, *Omicron Variant: What You Need to Know* ("[A]nyone with Omicron infection, regardless of vaccination status . . . can spread the virus to others"), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited May 9, 2022).

pbreen@thomasmoresociety.org
mwhittaker@thomasmoresociety.org

*/s/ Michael G. McHale*
Michael G. McHale
**THOMAS MORE SOCIETY**
10506 Burt Circle, Ste. 110
Omaha, NE 68114
402-501-8586
mmchale@thomasmoresociety.org

Joseph Brown (CO # 54986)
Theresa Lynn Sidebotham
**Telios Law PLLC**
19925 Monument Hill Dr.
Monument, CO 80132
775-248-8147
jbb@telioslaw.com
*Counsel for Plaintiffs-Appellants*

## Reason Oral Argument is Necessary

Oral argument is necessary due to the complexity and importance of the constitutional issues involved, including the application of multiple First Amendment and justiciability principles to 17 different Plaintiffs, all of whom are suffering ongoing irreparable harm.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This document complies with the type-volume limitation of Fed. R. App. P. 32(a) because, excluding the parts of the brief exempted by Fed. R. App. P. 32, this brief contains 6,480 words.

2.      This document complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(7) because this document has been prepared using Microsoft Word in 14-point Times New Roman font.

<u>/s/ Michael McHale      </u>

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served on May 9, 2022, via CM/ECF on all counsel of record.

<u>/s/ Michael McHale</u>